## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| LISA COOK, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No. 1:25-cv-02903-JMC |
| | ) | |
| DONALD J. TRUMP, *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## DEFENDANT DONALD J. TRUMP'S OPPOSITION TO PLAINTIFF'S
## MOTION FOR A TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

BACKGROUND ................................................................................................4

LEGAL STANDARD .........................................................................................6

ARGUMENT ......................................................................................................6

I.    Dr. Cook's Substantive Challenge Is Not Likely To Succeed ...............6

    A.    The determination of cause is committed to the discretion
        of the President. ...............................................................................7

    B.    In any case, the President identified sufficient cause here ..........9

    C.    Dr. Cook's contrary arguments are untenable. ...........................14

II.   Dr. Cook's Procedural Challenge Is Not Likely To Succeed ................17

    A.    Dr. Cook had no entitlement to notice or a hearing. ..................17

    B.    In any event, Dr. Cook was given sufficient notice and an
        opportunity to respond. ................................................................20

III.  The Balance of Equities Favors the Government ...................................23

CONCLUSION ................................................................................................27

**INTRODUCTION**

The Federal Reserve Act (FRA) empowers the President of the United States to appoint (by and with the advice and consent of the Senate) the members of the Board of Governors of the Federal Reserve System. 12 U.S.C. § 241. Those Governors serve for fixed terms, "unless sooner removed for cause by the President." *Id.* § 242. The statute thus expressly contemplates that, even setting aside his Article II authority over principal officers, the President retains broad discretion to remove a Governor for "cause."

That is what the President did here. Following nomination and Senate confirmation, Dr. Lisa Cook began serving as a Governor of the Board in May 2022. Earlier this month, the Director of the Federal Housing Finance Agency (FHFA) referred Dr. Cook for potential criminal prosecution over what appear to be false representations in a pair of mortgage agreements that Dr. Cook entered in 2021. In both agreements—entered within just weeks of each other—Dr. Cook represented that she would occupy each property as her "principal residence." The President publicized this referral, and made clear that he viewed this deceptive and potentially criminal conduct as grounds for termination. Yet Dr. Cook offered no defense to the charges—not in public or in private. Accordingly, five days later, the President terminated Dr. Cook for cause from her service as a Governor. As he explained: "The American people must be able to have full confidence in the honesty of the members entrusted with setting policy and overseeing the Federal Reserve."

Dr. Cook now asks this Court to override the President's determination and to reinstate her as Governor—and to do so in an emergency TRO posture, no less.  That request is meritless for multiple independent reasons.

To start, Dr. Cook is highly unlikely to prevail on the merits.  Removal for "cause" is a capacious standard, and one Congress has vested in the discretion of the President.  Even if it were subject to any judicial review—and over a century of caselaw suggests it is not—that review would have to be highly deferential, lest it intrude into the President's constitutional authority over principal officers.  And under any standard, making facially contradictory statements in financial documents—whether a criminal burden of proof could be sustained or not—is more than sufficient ground for removing a senior financial regulator from office.  Dr. Cook's contrary claim rests instead on an artificially narrow interpretation of "cause" that finds no support in the statutory text, and that would prevent the President from removing Dr. Cook even if she were criminally convicted for fraud committed before taking office.

Dr. Cook also presses a procedural objection—that she was deprived of notice and an opportunity to respond to the President's concern.  But no court has ever extended those due-process protections for employees to principal officers of the United States.  Nor does the FRA purport to do so.  In any case, the President gave Dr. Cook notice when he publicized the FHFA referral on August 20—and only acted to terminate her five days later, after it was clear that no adequate response was forthcoming.

Incredibly, Dr. Cook even now hazards no explanation for her conduct and points to nothing she would say or prove in any "hearing" that would conceivably alter the President's determination that the perception of financial misconduct alone is intolerable in this role. Under these circumstances, there is certainly no equitable basis for a reinstatement injunction.

Turning to the balance of equities, recent decisions from the Supreme Court and the D.C. Circuit leave no doubt that reinstatement injunctions are improper, especially in a preliminary posture. Indeed, since January 2025, those courts have stayed no fewer than 9 injunctions purporting to reinstate federal officers removed by the President. Instead of grappling with those orders—which, as the Supreme Court has recently reminded, are binding as to application of the equitable factors—Dr. Cook repeatedly cites instead *the orders that were stayed* and even a Supreme Court *dissent*.

This recent precedent aside, Dr. Cook identifies no irreparable harm that requires overnight relief, or even relief within the next 14 days. Indeed, the next meeting of the Board is not scheduled to occur until September 16, beyond the default date for expiration of a TRO. Meanwhile, the President has a strong interest in exercising his statutory authority to remove a federal officer for cause, and the public has a strong interest in stable governance at the Federal Reserve—a stability that would be undercut by the type of ping-pong injunctions and stays that have characterized other litigation.

For all of these reasons, the Court should deny the requested TRO.

## BACKGROUND

The Federal Reserve System was established in 1913 by the FRA. *See* 12 U.S.C. § 221 *et seq.* It consists of the Board of Governors, the Federal Open Market Committee, and twelve regional Federal Reserve banks that serve financial institutions in their regions. *Id.* § 222. *See generally United States ex rel. Kraus v. Wells Fargo & Co.*, 943 F.3d 588, 592 (2d. Cir. 2019).

The Governors of the Board are "appointed by the President, by and with the advice and consent of the Senate." 12 U.S.C. § 241. In addition, the FRA provides that:

> Upon the expiration of the term of any appointive member of the Federal Reserve Board in office on August 23, 1935, the President shall fix the term of the successor to such member at not to exceed fourteen years, as designated by the President at the time of nomination, but in such manner as to provide for the expiration of the term of not more than one member in any two-year period, and thereafter each member shall hold office for a term of fourteen years from the expiration of the term of his predecessor, *unless sooner removed for cause by the President.*

12 U.S.C. § 242 (emphasis added).

Dr. Cook was appointed to the Board in 2022, to fill the remainder of a Board term that expired in 2024. Dkt. 1 (Compl.) ¶¶ 29-30. In 2023, President Biden nominated Dr. Cook to serve a full term as a Governor, and she was confirmed by the Senate in the fall of 2023. *Id.* ¶ 31.

Earlier this month, the Director of the FHFA, William Pulte, sent a criminal referral letter to the Department of Justice, detailing instances of potential mortgage fraud by Dr. Cook. Compl. ¶ 43. In particular, Director Pulte identified and attached two mortgage agreements that Dr. Cook entered

in June and July 2021 (less than a year before joining the Federal Reserve Board), in which Dr. Cook represented that she would occupy and use both of the properties as her "principal" residence over the 12 months to follow. *Id.*, Ex. A. Director Pulte's letter explained that mortgages on principal residences typically involve better terms than mortgages on secondary residences, since the latter are viewed as more risky. *See id.*

Both Director Pulte and President Trump publicly released the referral letter on August 20, 2025. Compl. ¶ 43. The President made clear that he viewed the alleged misconduct as sufficient grounds to "fire her." *Id.* ¶ 45. Yet Dr. Cook did not respond to the letter or offer any defense of her contradictory representations in the mortgage documents. Instead, in a statement released by the Federal Reserve Board and quoted in the *New York Times*, she stated: "I have no intention of being bullied to step down from my position because of some questions raised in a tweet." *Trump Demands a Fed Governor Resign, Escalating Campaign to Remake Central Bank*, N.Y Times (Aug. 20, 2025).

Five days later, after it was clear that no response or defense from Dr. Cook was forthcoming, the President removed her from her office "for cause." Dkt. 1-4. He explained that neither he nor the American people could have confidence in her "honesty" as a financial regulator given her "deceitful and potentially criminal conduct in a financial matter." *Id.* And, "[a]t a minimum," the conduct reflects "gross negligence" that undermines her "trustworthiness as a financial regulator." *Id.*

5

## LEGAL STANDARD

"A temporary restraining order is 'an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion.'" *State v. Musk*, 769 F. Supp. 3d 1, 4 (D.D.C. 2025). "[A] party seeking a TRO must establish '(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest.'" *Id.* at 4-5. A court can "begin[] and end[]" its analysis when a plaintiff fails to demonstrate irreparable harm. *Id.* at 5; *see also, e.g.*, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

## ARGUMENT

### I.    Dr. Cook's Substantive Challenge Is Not Likely To Succeed.

Dr. Cook's lead argument—and the only substantive challenge that she mounts to her termination—is that the President did not have "cause" to fire her under the FRA. *See* Mot. 9-15. That challenge is without merit; at bare minimum, she has not demonstrated a sufficiently strong likelihood of success to justify the extraordinary remedy that she seeks. The President's judgment about what constitutes "cause" is not subject to judicial second-guessing. Even if some limited judicial review were appropriate, it would necessarily be highly deferential to avoid casting constitutional doubt on the statute. And under any standard, the apparent falsification of financial documents is enough to justify

removing someone from a senior financial regulatory role—even if the misconduct arose in a personal context, occurred before the official's period of service, and does not rise to the criminal level. Dr. Cook's contrary reading of the statute is both textually and pragmatically indefensible.

### A. The determination of cause is committed to the discretion of the President.

At the outset, Dr. Cook simply assumes that the federal courts are free to second-guess the President's determination under the FRA that a particular reason for removal constitutes "cause." Precedent teaches otherwise. At the least, this hurdle further reduces Dr. Cook's likelihood of success.

Over a century ago, the Supreme Court held that when a statute permits "removal for cause," that "is a matter of discretion and not reviewable," at least if the "causes are not defined" by the statute. *Reagan v. United States*, 182 U.S. 419, 425 (1901). On that basis, the Court refused to consider whether a United States Commissioner had been properly removed for cause. If the statute had "prescribed" permissible causes, the Court said, it might have been proper to consider whether a particular removal comported with those terms. *Id.* at 427. But absent such a specification, there was no room for review. *See Reagan* v. *United States*, 35 Ct. Cl. 90, 105 (1900) ("Where the statute gives a power of removal 'for cause,' without any specification of the causes, this power is of a discretionary … nature, and unless the statute otherwise especially provides, the exercise thereof cannot be reviewed by any other tribunal, with respect either to the cause or to its sufficiency or extent, or otherwise.").

Here, of course, the FRA says only that the President may remove a Governor for "cause," but there is no "specification of the causes" that suffice, *id.*, and cause is otherwise "not defined" by the Act, as Dr. Cook concedes. TRO Br. 9. *Reagan* thus applies, and the President's removal of Dr. Cook for cause "is a matter of discretion and not reviewable." *Reagan*, 182 U.S. at 425.[1]

More recent precedent confirms that conclusion. In *Dalton v. Specter*, the Supreme Court held that "[w]here a statute … commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." 511 U.S. 462, 477 (1994). Presidential action may be reviewed for compliance with the Constitution, but mere claims that the President "has acted in excess of his statutory authority" through exercise of discretion vested by statute are not cognizable unless Congress has provided for that review. *Id.* at 472; *see also Martin v. Mott*, 25 U.S. 19, 31-32 (1827) ("Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction, that the statute constitutes him the sole and exclusive judge of the existence of those facts.").

Here, as in *Dalton*, Dr. Cook raises only an ordinary statutory claim— that the President exceeded his power under the FRA by terminating her for a reason that does not rise to the level of "cause" within the statutory meaning. And, like the plaintiffs in *Dalton*, Dr. Cook "underestimates the President's

---

[1] Dr. Cook cites *Reagan*, but for a proposition the Court couched as applicable only if "causes of removal" had been "prescribed by law." 182 U.S. at 425. She ignores that, here as there, the statute did not define or specify any such causes.

authority under the Act, and the importance of his role." 511 U.S. at 470. Again, the statute does not define what constitutes "cause," which means the President necessarily must make a discretionary judgment in exercising this power. He assuredly needs a reason, but the sufficiency and adequacy of that reason is committed to his discretion—and, as such, "judicial review of the President's decision is not available." *Id.* at 477. Congress has, on occasion, provided for judicial review of for-cause removal determinations. *See, e.g.*, *Morrison v. Olson*, 487 U.S. 654, 663–64 (1988) (describing statute allowing special counsel to seek judicial review of removal). But Congress did not do so here, so the President's determinations are conclusive.

**B.    In any case, the President identified sufficient cause here.**

Even assuming judicial review is available, Dr. Cook's claim is without merit. The grounds the President cited—evidence of deceitful and potentially criminal conduct—plainly constitute "cause" under any standard.

**1.**    Start with the capacious standard at issue here. Because the FRA does not define "cause," it must be interpreted "consistent with [its] ordinary meaning at the time Congress enacted the statute." *Wisc. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018). To discern a term's ordinary meaning, courts look to contemporary dictionary definitions. *See, e.g.*, *id.*; *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 231 (2014). And when Congress enacted the FRA in 1913, "cause" was ordinarily understood to mean a "motive or reason," Wharton's Law-Lexicon 150 (11th ed. 1911), or "ground of action," Black's Law Dictionary

178 (2d ed. 1910). These general and flexible definitions do not limit what sort of "reason" or "ground" qualifies as "cause," and instead cover any articulable justification that the President deems sufficient to warrant removal—subject, of course, to the caveat that mere policy disagreement does not suffice, lest the removal restriction have no effect whatsoever. *See infra* at 16.

The canon of constitutional avoidance also counsels in favor of giving "cause" a broad construction, as an overly restrictive interpretation would unconstitutionally interfere with the President's Article II authority. *See Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 787 (2000) (explaining avoidance canon). Even assuming that the Constitution permits Congress to impose *some* restrictions on the President's removal power given the unique historical role of the Federal Reserve—a question the Court need not confront here, because the President's actions are consistent with the statute—such restrictions may "not interfere with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II." *Morrison*, 487 U.S. at 690. A construction of "cause" that does not permit the President broad latitude to remove a principal officer who is suspected of serious misconduct would raise a serious question under Article II. *Cf.* John F. Manning, *The Independent Counsel Statute: Reading "Good Cause" In Light of Article II*, 83 Minn. L. Rev. 1285, 1330 (1999) (discussing "persuasive reasons for concluding that a narrow construction of 'good cause' … would raise a serious question under Article II").

**2.**      Applying those definitions, and especially in light of the canon of constitutional avoidance, the "cause" that the President invoked in his letter removing Dr. Cook is plainly sufficient.

The FHFA referred Dr. Cook to the Justice Department for potential criminal prosecution involving mortgage fraud.  As set forth in the referral, Dr. Cook entered two mortgage agreements—for properties in different states (Michigan and Georgia)—within just a few weeks of one another in the summer of 2021, less than a year before starting her service as a Governor.  Each of the two mortgage agreements included a covenant representing that the borrower (Dr. Cook) would "occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution" of the mortgage "and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy" (absent consent from the lender). And both agreements proceed to specify that this representation "concerning Borrower's occupancy of the Property as Borrower's principal residence" is "[m]aterial" to the lender.  *See* Referral Letter Ex. A, §§ 6, 8; Ex. B, §§ 6, 8.  As the referral letter explained, these representations are important because secondary residence mortgages are viewed as "significantly riskier" to lenders and thus tend to trigger higher interest rates.  *See* Referral Letter at 2.

To state the obvious, it is difficult, if not impossible, to see how Dr. Cook could possibly have honestly represented that she intended to occupy and use both a property in Michigan and a condominium in Atlanta as her "principal

residence" during the same period.  *See Principal*, New Oxford American Dictionary (3d ed. 2010) ("first in order of importance; main"); *In re Wong*, 598 B.R. 827, 832 (Bankr. D. Md. 2019) (explaining a debtor can have "only one" "principal residence").  One of these properties was presumably intended to be a secondary residence or an investment property.  If those contradictory representations were made knowingly, they could constitute federal felonies. *See, e.g.*, 18 U.S.C. § 1344 (bank fraud); *id.* § 1014 (false statements to financial institution).  And if they were made inadvertently, they still demonstrate lack of care or negligence with respect to important financial matters.

Either way, it is entirely reasonable to treat this as "cause" for removal from office.  Governors of the Federal Reserve exercise significant power over the Nation's financial system.  *See Albrecht v. Comm. on Employee Benefits of Fed. Reserve Employee Benefits Sys.*, 357 F.3d 62, 67 (D.C. Cir. 2004).  For someone in such a role, engaging in deceitful and potentially criminal conduct involving financial matters should be disqualifying.  *Cf. Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 503 (2010) (observing that "[t]he President might have less than full confidence in, say, a Board member who cheats on his taxes," and thus cannot be deprived of the power to remove that member).  And even the perception of this type of impropriety is damaging to the public's confidence in the integrity of the financial system, and thus suffices as "cause" for removal even if there were some technical defense to the charges.

Dr. Cook objects that the President did not "unambiguously" assert that she "actually committed a crime." TRO Br. 14. Indeed, the President properly did not purport to pre-judge criminal liability, which may depend on (among other things) Dr. Cook's *mens rea* when making the representations. But this is not a criminal proceeding; Dr. Cook has not been subjected to any criminal punishment. The President need not prove criminal acts beyond a reasonable doubt to remove a principal officer. And it is too glib to compare this to "jaywalking" (TRO Br. 14); the documents here suggest potentially felonious financial impropriety in the context of a senior official with oversight over the financial system. It is not credible to say these concerns are legally inadequate.

Somewhat remarkably, Dr. Cook's motion never even tries to grapple with the FHFA referral or the President's concern on the merits. All she offers is that the allegations are "unsubstantiated." It is not clear what she means by that—the referral letter included the mortgage agreements, which speak for themselves; the contradictory statements are self-evident. Dr. Cook does not try to claim that the contradictory representations were somehow truthful, or maintain that she acted without scienter. As explained, even that would not matter in this context—those might be defenses to criminal charges, but are not sufficient to restore public trust in the Federal Reserve Board. Yet Dr. Cook's refusal even to offer an explanation or defense makes it all the more impossible to conclude that the "cause" standard is unsatisfied.

## C.    Dr. Cook's contrary arguments are untenable.

In contending that the President lacked cause to remove her, Dr. Cook rests on interpretations of the FRA's "for cause" removal provision that are not supported by the statute or common sense.

*First*, Dr. Cook argues that "cause" means "inefficiency, neglect of duty, malfeasance in office, or comparable misconduct." TRO Br. at 9. But she provides no textual basis for that reading. And basic principles of statutory interpretation point in the opposite direction. Soon before Congress enacted the relevant provision, the Supreme Court considered the constitutionality of what Dr. Cook calls the "INM" standard—a particular formulation Congress used to insulate FTC Commissioners from removal. *See* 15 U.S.C. § 41 ("Any Commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office."); *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). Yet Congress *did not* use that language in the FRA. Instead, it specified that Governors of the Federal Reserve hold office for a term "unless sooner removed for cause by the President." 12 U.S.C. § 242. Adopting Dr. Cook's construction of "for cause" would ignore Congress's choice to include the INM standard in one statute while using the broader "cause" standard in another. *See Russello v. United States*, 464 U.S. 16, 23 (1983) (refraining from concluding that "differing language ... has the same meaning").[2]

---

[2] The Supreme Court did not hold otherwise in *Free Enterprise Fund*. *Contra* TRO Br. at 9 n.19. The statute at issue there did not use the term "cause" at all, 15 U.S.C. § 78d, and the Court merely assumed the applicability of the INM standard because "[t]he parties agree[d]" to that premise. 561 U.S. at 487.

*Second*, Dr. Cook is also wrong to suggest that misconduct that occurred "in one's capacity as a private citizen" or before entering office cannot qualify as "cause" for removal. TRO Br. at 13. Those artificial limitations have no basis in the text of the removal provision at issue here. No language in the FRA limits "cause" to conduct occurring over the course of employment. Nor has Dr. Cook cited a single case that supports her atextual gloss. This failure is unsurprising, as Dr. Cook's interpretation would insulate all manner of gross wrongdoing. On her theory, for example, the President could not remove a Governor who was revealed to have committed massive financial fraud—so long as it happened before confirmation. That cannot possibly be right.

*Third*, Dr. Cook's related suggestion—that misconduct does not count as "cause" in the absence of a criminal conviction—is also baseless. The "beyond a reasonable doubt" standard used to assess whether a criminal defendant may be deprived of his life or liberty cannot possibly be the same standard required to assess whether a principal officer of the United States is entitled to continue in office. Here too, the canon of constitutional avoidance counsels against Dr. Cook's artificial limits. The Supreme Court has never suggested that such a cramped reading of "for-cause" removal protections could be consistent with the Constitution. *See Morrison*, 487 U.S. at 690; *Free Enterprise Fund*, 561 U.S. at 503. The severe restrictions Dr. Cook imagines would unduly interfere with the President's Article II authority, even assuming Congress may impose some limits in the unique context of the Federal Reserve.

*Finally*, Dr. Cook argues that the President removed her from office based on a policy disagreement relating to interest rates, which is not sufficient to constitute "cause." *See Wiener v. United States*, 357 U.S. 349, 356 (1958) (explaining that for-cause restrictions mean the President cannot remove an official "merely because he wanted his own appointees"). But the President did not invoke a policy disagreement as the cause for Dr. Cook's removal. Rather, his letter to Dr. Cook made clear that he was acting based on her "deceitful and potentially criminal conduct" in connection with the mortgage agreements. As explained above, deceptive and fraudulent conduct undoubtedly qualifies as "cause" under the FRA, even if policy disagreements do not.

Insofar as Dr. Cook seeks a ruling that the President's stated rationale was pretext, the Court should decline "to probe the sincerity of the [President's] stated justifications" for an action when the President has identified a facially permissible basis for it. *Trump v. Hawaii*, 585 U.S. 667, 702 (2018); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 756 (1982) (rejecting a theory that would require "an inquiry into the President's motives" because "[i]nquiries of this kind could be highly intrusive"); *Am. Foreign Serv. Ass'n v. Trump*, 2025 WL 1742853, at *3 (D.C. Cir. June 20, 2025) (explaining that *Hawaii* did not "inspect" the President's "rationale"). Not only does precedent foreclose that path as a matter of law, but Dr. Cook offers nothing but speculation to support her charge of insincerity. That is no basis to set aside a presidential action committed to the President's discretion by law.

## II.    Dr. Cook's Procedural Challenge Is Not Likely To Succeed.

Dr. Cook does not have any better likelihood of success on her procedural challenge to her termination.  She argues that President Trump deprived her of a right under the Fifth Amendment's Due Process Clause and the FRA by failing to provide sufficient notice and opportunity to be heard before removing her from office.  But neither the Constitution nor the FRA confers any such right here.  And, regardless, the President *did* give Dr. Cook ample notice and opportunity to be heard.  She simply declined to take advantage of it—and even now declines to defend her own conduct, making clear that a "hearing" would have made no difference.  This is not remotely grounds for an injunction.

### A.    Dr. Cook had no entitlement to notice or a hearing.

Starting with the Due Process Clause, courts "examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the [government]; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient."  *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).  At the first step, a court "must look to see if the interest is within the [Due Process Clause]'s protection of liberty and property" "to determine whether due process requirements apply in the first place."  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570-71 (1972).  Only "[i]f the plaintiff has been deprived of a protected interest" must the Court proceed to the next step.  *Ralls Corp. v. Committee on Foreign Inv.*, 758 F.3d 296, 315 (D.C. Cir. 2014).

Here, Dr. Cook's procedural due-process claim fails at the first step, as she had no property interest in her public office and was thus owed no notice or opportunity to be heard. The critical point here is that Dr. Cook was acting as a *principal officer of the United States*, not a mere "public employee" who "possesses a property interest in her continued employment." TRO Br. at 16. *See Melcher v. Fed. Open Mkt. Comm.*, 644 F. Supp. 510, 519 (D.D.C. 1986), *aff'd,* 836 F.2d 561 (D.C. Cir. 1987) (noting that Board of Governors members are "unquestionably [] principal officers of the United States").

As a principal officer, Dr. Cook had no property interest in her office. The Supreme Court held long ago that "public office is not property" and that "the nature of the relation of a public officer to the public is inconsistent with either a property or a contract right." *Taylor v. Beckham*, 178 U.S. 548, 576-77 (1900). Similarly, the Supreme Court had "little difficulty" deciding that "an officer appointed for a definite time or good behavior" did not have any "vested interest or contract right in his office" and thus could not maintain a due-process claim. *Crenshaw* v. *United States*, 134 U.S. 99, 104 (1890); *see also Baker v. Carr*, 369 U.S. 186, 232 (1962) (describing *Taylor* as having "held on the merits that the ousted candidates had suffered no deprivation of property without due process of law"). The Supreme Court decisions remain binding on the question of whether a federal officer has a constitutionally protected property interest in her public office. The answer is no, and that disposes of Dr. Cook's claim under the Due Process Clause.

By contrast, the cases that Dr. Cook cites are inapposite. They involved mere *employees*—who "do[] not exercise significant governmental authority," *Kennedy v. Braidwood Mgmt., Inc.*, 145 S. Ct. 2427, 2442 (2025). For example, in *Cleveland Board of Education v. Loudermill*, the Court held that a security guard, who was a "classified civil servant" under Ohio law, was entitled to oral or written notice with an explanation of the employer's evidence and an opportunity to present his story. 470 U.S. 532, 535, 545-46 (1985). And in *Esparraguera v. Department of the Army*, the D.C. Circuit held that a civilian personnel attorney had a property interest in her employment because the Civil Service Reform Act of 1978 and the agency's regulations provided "sufficiently particularized standards or criteria" to "create a property interest" in the employee's position. 101 F.4th 28, 35-36 (D.C. Cir. 2024). But Dr. Cook does not cite any authority extending those procedural protections to principal officers and, as explained, Supreme Court authority says the opposite.

Nor can Dr. Cook infer any procedural protections from the FRA. The statute says only that a "member shall hold office for a term of fourteen years from the expiration of the term of his predecessor, unless sooner removed for cause by the President." 12 U.S.C. § 242. It does not provide that the President can remove a Governor for cause *only after notice and a hearing*. That silence does not allow a court to infer those protections; quite the opposite. Just as a for-cause restriction must be "very clear and explicit," *Braidwood*, 145 S. Ct. at 2448, so too for any procedural limitation on removal. Other statutes do

provide for a pre-removal hearing: For example, administrative law judges can be removed "only for good cause established and determined by the Merit Systems Protection Board on the record after opportunity for hearing before the Board." 5 U.S.C. § 7521. No similar requirement exists here.

Dr. Cook invokes the traditional common-law rule requiring notice and a hearing—but once again ignores the Supreme Court's clarification that this rule applies only "where causes of removal are specified." *Reagan*, 182 U.S. at 425. That rule did not apply in *Reagan* because the statute there referred to "causes" in general but offered no particularized enumeration. Neither does the FRA; the common-law rule is therefore equally inapplicable here.

In short, Dr. Cook had neither constitutional nor statutory entitlement to notice and a hearing before the President removed her for cause.

## B.    In any event, Dr. Cook was given sufficient notice and an opportunity to respond.

In any event, Dr. Cook was given adequate process here. She had notice of the charges against her, fair warning that the President viewed the FHFA referral as grounds for termination, and ample opportunity to share her side of the story had she wanted to. Under these circumstances, there is no viable procedural challenge to mount, let alone grounds for an injunction.

As to notice, Dr. Cook acknowledges that the President publicized the FHFA referral on August 20, 2025. *See* Compl. ¶¶ 43-45. The referral, in turn, set out the facts and evidence in detail. Dr. Cook never explains what more she would have wanted to know.

Turning to opportunity to be heard, there is no requirement that any hearing be "elaborate"—all that is needed is "an initial check against mistaken decisions" so the decision-maker can ascertain "whether there are reasonable grounds to believe that the charges against the employee are true." *Loudermill*, 470 U.S. at 545-46.   Here, that objective was satisfied when the President gave notice that he viewed the mortgage representations as grounds to fire Dr. Cook, and then waited five days for her to respond before proceeding with the threatened termination.   She simply declined the chance to offer a competing account of the facts.   Instead, she declared only that she would not "be[] bullied to step down from [her] position because of some questions raised in a tweet."   *Supra* at 5.   Dr. Cook was entitled to adopt that defiant posture. But having failed to offer any response to the FHFA materials, she cannot now complain that the President's termination was procedurally deficient.   She had the opportunity to explain why no misconduct occurred, but she did not.

Even now, it is not clear what a hearing would accomplish, because Dr. Cook continues to offer no meaningful response to the misconduct charges and evidence.   Dr. Cook has filed an 86-paragraph federal complaint and a 23-page memorandum seeking a TRO, yet she has chosen not to dispute any of the facts undergirding the determination.   All she offers is the conclusory claim that the accusations against her are "unsubstantiated"—even though the mortgage documents themselves are facially contradictory.   The purpose of notice and a hearing "is to provide the person an opportunity to clear [her] name" and "to

refute the charge." *Codd v. Velger*, 429 U.S. 624, 627 (1977). For a "hearing mandated by the Due Process Clause [] to serve any useful purpose, there must be some factual dispute between an employer and a discharged employee which has some significant bearing on the employee's reputation." *Id.* President Trump's letter was specific that the apparent false statements on the mortgage agreements were "potentially criminal conduct in a financial matter" or at least "exhibit[ed] the sort of gross negligence in financial transactions that calls into question [Dr. Cook's] competence and trustworthiness as a financial regulator." Dkt. 1-4. She has put no facts in dispute demonstrating that this assessment was wrong, despite having multiple opportunities to do so.

Insofar as Dr. Cook hints (but never directly says) that the contradictory representations resulted from a mere "clerical error" rather than intentional wrongdoing, that makes no difference. The President made clear that even if the representations were not criminally wrongful, they at minimum reflect a lack of due care in financial matters that is incompatible with the role of a Governor. The Federal Reserve has "a special historical status," *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 222 (2020), partially because its members have such an important role in the American and world economy, and a Governor's failure to carefully read her own financial documents casts a shadow over the Federal Reserve's decisions. Even if Dr. Cook's actions were negligent rather than fraudulent, they are sufficient cause to remove her from office; no further process would conceivably have mattered.

### III.    The Balance of Equities Favors the Government.

The "public interest and balance of equities factors merge" where, as here, "the government is the party" against whom an injunction is sought. *MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021). Those equitable factors weigh decisively against reinstatement by preliminary injunction.

The Supreme Court has recently recognized that "the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." *Trump v. Wilcox*, 145 S. Ct. 1415 (May 22, 2025); *see also Trump v. Boyle*, 145 S. Ct. 2653, 2654 (July 24, 2025). Those orders are binding precedent on the application of the equitable factors, and thus require denial of Dr. Cook's TRO motion. *Boyle*, 145 S. Ct. at 2654 ("Although our interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases.").

Ignoring the Supreme Court's orders in *Wilcox* and *Boyle*, Dr. Cook cites three district-court decisions from this district granting injunctions reinstating federal officers removed by the President. *See Harper v. Bessent*, 2025 WL 2049207 (D.D.C. July 22, 2025); *LeBlanc v. U.S. Privacy and Civil Liberties Oversight Bd.*, 2025 WL 1454010 (D.D.C. May 21, 2025); *Wilcox v. Trump*, 775 F. Supp. 3d 215 (D.D.C. Mar. 6, 2025). Yet she declines to mention that *all three injunctions were stayed on appeal*, the first two by the D.C. Circuit and the third by the Supreme Court itself. *See Harper v. Bessent*, No. 25-5258,

2025 WL 2426660 (D.C. Cir. Aug. 21, 2025); *LeBlanc v. U.S. Privacy and Civil Liberties Oversight Board*, No. 25-5197, 2025 WL 1840591 (D.C. Cir. July 1, 2025); *Wilcox*, 145 S. Ct. at 1415.  Obviously, stayed rulings do not help Dr. Cook.  "[T]his Court would have to blind itself … to assign the weight to these cases that she urges.  In the end, none of the injunctions stuck." *Perlmutter v. Blanche*, No. 25-cv-1659, 2025 WL 2159197, at *5 (D.D.C. July 30, 2025).

Even setting aside *Wilcox* and *Boyle*, Dr. Cook identifies no irreparable harm absent a TRO.  "The irreparable injury requirement sets a 'very high bar.'" *English v. Trump*, 279 F. Supp. 3d 307, 333 (D.D.C. 2018).  To clear it, a plaintiff "must show '[t]he injury complained of is of such imminence that there is a 'clear and present' need for equitable relief,'" and "the injury must be beyond remediation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. In the removal context, these requirements will be met only in a "genuinely extraordinary situation." *Sampson v. Murray*, 415 U.S. 61, 92 (1974).

Dr. Cook principally alleges irreparable harm in the form of deprivation of her "Presidentially-appointed and Senate-confirmed role."  TRO Br. at 17-18.  But the D.C. Circuit has rejected the "statutory right to function" theory of irreparable injury. *See Dellinger v. Bessent*, No. 25-5052, 2025 WL 887518 (D.C. Cir. Mar. 10, 2025).  There, the court held that even if the discharged Special Counsel's "removal [wa]s ultra vires," a deprivation of his "statutory right to function in office" was not irreparable: "At worst, [the discharged Special Counsel] would remain out of office for a short period of time," whereas

"the potential injury to the government of both having its designated Acting Special Counsel sidelined and unable to act while also having to try and unravel [the discharged Special Counsel's] actions is substantial." *Id.* at *4.

*Dellinger* did not break any new ground; the longstanding rule is that, absent a "genuinely extraordinary situation," loss of employment does not constitute irreparable harm, *Sampson*, 415 U.S. at 92 n.68. "Cases are legion holding that loss of employment does not constitute irreparable injury." *English*, 279 F. Supp. 3d at 334; *see also Davis v. Billington*, 76 F. Supp. 3d 59, 65-66 (D.D.C. 2014) (collecting cases). And this rule is not limited to rank-and-file employees. Courts have repeatedly held that deprivation of a unique, singular, or high-level position is not irreparable either.[3]

Against this weight of authority, Dr. Cook cites just one district court decision, *Berry v. Reagan*, Civ. A. No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983), *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983). It is inapposite. There, the district court deemed the plaintiff's harm from removal to be irreparable because the agency itself was set by statute to terminate within a few weeks— meaning the plaintiff commissioners *could not* be re-appointed to their posts if their removals were eventually deemed unlawful. *Id.* at *5; *see English*, 279

---

[3] *See, e.g.*, *Rubino v. City of Mount Vernon*, 707 F.2d 53 (2d Cir. 1983) (mayoral-appointed City Assessor); *EEOC v. City of Janesville*, 630 F.2d 1254 (7th Cir. 1980) (Chief of Police); *Levesque v. Maine*, 587 F.2d 78 (1st Cir. 1978) (Maine Commissioner of Manpower); *Brehm v. Marocco*, Civ. A. No. 25-0660, 2025 U.S. Dist. LEXIS 71326 (D.D.C. Mar. 11, 2025) (president of U.S. Africa Development Foundation); *Burns v. U.S. Gen. Act. Off. Emps. Fed. Credit Union*, Civ. A. No. 88-3424, 1988 WL 134925 (D.D.C. Dec. 2, 1988) (President of Credit Union Board of Directors).

F. Supp. 3d at 335 ("in *Berry*, absent an injunction, any harm suffered by the commissioners was plainly irreparable because the commission would have expired and they could not have been reinstated to it"). Here, by contrast, there is no evidence that the Federal Reserve Board faces a similar risk. While Dr. Cook speculates that the President might announce a new nominee to replace her (TRO Br. at 17-18), that is conjectural, and even such an announcement would not be tantamount to a replacement, which would require a formal nomination followed by Senate confirmation.

Dr. Cook also argues that she faces irreparable harm to "her efforts as Governor to preserve the independence of the Federal Reserve Board." TRO Br. at 18. She suggests that the President's "actions are undermining the public's perception of the Federal Reserve as independent, directly threatening its mission of providing stability." *Id.* But despite its independence, members of the Board are subject to removal for cause, and the President's actions to terminate Dr. Cook based on the mortgage impropriety should strengthen, not diminish, the public's perception of the Federal Reserve's integrity.

In any event, this argument is patently insufficient to show irreparable harm; Dr. Cook "must demonstrate the likelihood of irreparable harm *to her* if an injunction does not issue." *English*, 279 F. Supp. 3d at 335 (emphasis in original); *see also Brehm*, 2025 U.S. Dist. LEXIS 71326, at *6-7 (denying TRO for lack of irreparable harm because plaintiff "has not identified any cognizable irreparable harm to *himself* as opposed to potential harm to the agency").

The district court in *Perlmutter v. Blanche* recently rejected a virtually identical "institutional" theory of irreparable harm in denying a preliminary injunction in that case. No. 25-cv-1659, 2025 WL 2159197 (D.D.C. July 30, 2025). The plaintiff, the removed Register of Copyrights, argued that her removal had inflicted "institutional harm to the Library of Congress and U.S. Copyright Office." *Id.* at *7. That was not enough to show irreparable harm, the court held: any "institutional harms to the Library or the Copyright Office, divorced from how those harms impact [the plaintiff] personally, cannot help her meet her burden." *Id.* (quoting *Sampson*, 415 U.S. at 92 n.68). So too here. Any suggestion that Dr. Cook's removal might undermine the Federal Reserve Board's independence is not an injury to her, as required by bedrock precedent, and thus cannot form the basis for preliminary injunctive relief.

In the end, here as in *Wilcox*, the balance of equities counsels against "the disruptive effect of the repeated removal and reinstatement of officers during the pendency of this litigation." 145 S. Ct. at 1415. Based on the equitable balancing too, this Court should deny the requested TRO.[4]

## CONCLUSION

For the reasons above, the Court should deny the TRO.

---

[4] Although the Court has no need to reach the issue here for all of the reasons explained above, the Court also lacks the equitable power to order reinstatement of a principal officer of the United States. *See In re Sawyer*, 124 U.S. 200, 212 (1888); *White* v. *Berry*, 171 U.S. 366, 377 (1898).

Dated:  August 29, 2025            Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney
General

ERIC J. HAMILTON
Deputy Assistant Attorney General

EMILY HALL
JOHN BAILEY
Counsel to the Assistant Attorney
General

*/s/ Christopher R. Hall*
CHRISTOPHER R. HALL
Assistant Branch Director
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 514-4778
E-mail: Christopher.Hall@usdoj.gov

*Counsel for Defendant Donald J. Trump*