**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LISA D. COOK, in her official capacity as a member of the Board of Governors of the Federal Reserve System and her personal capacity, | Civil Action No. 1:25-cv-02903-JMC |
| *Plaintiff*, | |
| *v.* | |
| DONALD J. TRUMP, in his official capacity as President of the United States, | |
| BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, both collectively and in their individual official capacities, | |
| JEROME H. POWELL, in his official capacity as Chair of the Board of Governors of the Federal Reserve System, | |
| *Defendants*. | |

**<u>PLAINTIFF LISA COOK'S REPLY IN SUPPORT OF HER
MOTION FOR TEMPORARY RESTRAINING ORDER</u>[1]**

---

[1] At the August 29 hearing, the Court and parties addressed the best process for addressing these issues (some of first impression). The Court suggested the possibility of an expedited merits decision on summary judgment and requested the the parties confer to present a schedule. *Id.* at 87:4. Prior to filing, we sought agreement with the government to dispense with further preliminary steps and proceed to expedited summary judgment with simultaneous filings on September 9, responses September 15, and the Court's consideration of a hearing thereafter. The government responded that it would only agree to convert the TRO proceeding to a preliminary injunction process. We submit that proceeding to expedited summary judgment is the better course if Defendants would agree to leave the status quo in place and not take steps to effectuate Governor Cook's removal in the interim. Absent such an agreement, we seek emergency relief to preserve the status quo and will continue to confer with the government. The parties will be submitting a joint status report.

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

ARGUMENT ................................................................................................................... 2

I.    THE COURT HAS THE AUTHORITY TO DETERMINE WHETHER THE
PRESIDENT COMPLIED WITH THE FRA'S "FOR CAUSE" REMOVAL
PROVISION. ................................................................................................... 2

    A.    The Government's Reliance on *Reagan v. United States* is Misplaced...... 2

    B.    Congress Intended for the FRA's "For Cause" Removal Provision To
Serve as a Limit on the President's Removal Power, Thus Giving
Courts The Obligation and Power To Review. ........................................... 5

II.    PRESIDENT TRUMP'S PURPORTED BASIS FOR FIRING GOVERNOR
COOK DOES NOT AMOUNT TO "CAUSE." ...................................................... 7

    A.    "For Cause" Is Best Construed to Mean the "Inefficiency, Neglect of
Duty or Malfeasance" Standard the Supreme Court Set Out in
*Humphrey's Executor* and Applied in Cases Since. ................................... 7

    B.    Based on Dictionary Definitions of the Word "Cause," the
Government's Position Grants the President More Authority to
Remove Members of the Federal Reserve Board than Almost All
Other Independent Agencies..................................................................... 10

    C.    Private Conduct Before Taking Office Could Not Amount to "Cause,"
and There are Other Remedies for Such a Circumstance. ........................ 12

    D.    Even If Pre-Office Conduct Were Considered Against the Broadest
Definition Of "Cause," The Allegation On Which President Trump
Took His Action Would Not Amount To "Cause." ................................... 13

III.    GOVERNOR COOK HAD A RIGHT TO PROPER NOTICE AND A
MEANINGFUL OPPORTUNITY TO BE HEARD PRIOR TO BEING
FIRED........................................................................................................... 17

    A.    By Providing for Removal Only "For Cause," The FRA Grants
Governor Cook a Statutory Right to Notice and a Hearing. ..................... 17

    B.    Given the Historic and Unique Status of the Federal Reserve Board,
Its Governors Have a Property Right Leading To a Due Process Right
To Notice and Hearing.............................................................................. 19

IV.    THE EVENTS BEFORE PRESIDENT TRUMP PURPORTEDLY FIRED
GOVERNOR COOK DO NOT AMOUNT TO PROPER NOTICE AND A
HEARING...................................................................................................... 22

    A.    President Trump's Reliance on the FHFA Criminal Referral
Communicated by Social Media Post is Not Adequate Notice ................ 22

    B.    Governor Cook Was Not Given Any Actual Opportunity To Be Heard.. 23

V.    THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF

FAVOR GOVERNOR COOK'S REQUEST FOR RELIEF ............................... 25

A.    Given The Unique Role of Federal Reserve Governors and The Allegation of Fraud, Removal Without Proper Procedures Would Cause Her Irreparable Harm. .................................................................. 25

B.    The Balance of Equities and Public Interest Strongly Support Governor Cook's Request. ........................................................................ 29

**CONCLUSION** ...................................................................................................... **30**

## INTRODUCTION

The Government agrees, as it must, that the President's power to remove a Federal Reserve Governor is limited by the inclusion in the Federal Reserve Act ("FRA") of a "for cause" requirement. But it then argues (ECF 13 "Gov't Br." at 9–10) for a "capacious" definition of "cause" that would "cover any articulable justification that the President deems sufficient to warrant removal" and argues (Gov't Br. 7–8) that courts have no power to review dismissals, even those that brazenly ignore the "cause" limitation. The Government's argument that "there isn't supposed to be review of that determination" (8/29/25 Hr'g Tr. 57:23–24) and that "[t]he President has a constitutional obligation to follow the law. It doesn't always mean it's subject to judicial review" (*id.* at 68:3–6) fly in the face of the Supreme Court's recent recognition that the Federal Reserve has a "distinct historical tradition" necessitating respect for the "cause" limitation to safeguard the independence of financial regulation and our Nation's economic stability. *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (May 22, 2025). Contrary to the Government's arguments, the term "cause" provides meaningful protection against removal—and courts must ensure that standard is followed when it comes to the "uniquely structured, quasi-private entity" that is the Federal Reserve. *Id.*

Similarly at odds with precedent, the Government would reduce the right to notice and a hearing—whether constitutional, statutory, or both—to be satisfied by a social media post followed by an immediate call by the President for the targeted official to resign. In fact, when the Court asked if the Government was arguing those things could satisfy the proper notice or hearing required, the Government answered: "Oh, yeah, no, I absolutely am." 8/29/25 Hr'g Tr. 62:25. That approach has no grounding in case law and would render Governor Cook's notice and hearing right entirely illusory.

This Court should reject the Government's sweeping and unprecedented arguments and

grant preliminary relief to preserve the status quo.

**ARGUMENT**

I.    **THE COURT HAS THE AUTHORITY TO DETERMINE WHETHER THE PRESIDENT COMPLIED WITH THE FRA'S "FOR CAUSE" REMOVAL PROVISION.**

**A. The Government's Reliance on *Reagan v. United States* is Misplaced.**

The Government relies on *Reagan v. United States*, 182 U.S. 419 (1901), to argue that the President's determination that cause exists for removal is unreviewable unless the statute prescribes specific grounds for removal. Gov't Br. at 20. According to the Government, *Reagan* "held that when a statute permits 'removal for cause,' that 'is a matter of discretion and not reviewable,' at least if the 'causes are not defined' by the statute." *Id.* at 7 (quoting *Reagan*, 182 U.S. at 425). But the Government ignores the facts, context, and reasoning of *Reagan* to advance this contorted reading. In reality, *Reagan* hurts the Government's case more than it helps it.

Start with the text of the statute. *Reagan* considered the rights of judicially appointed commissioners without fixed tenure who were, under their authorizing statute, removable "for causes *prescribed by law*." *Id.* at 424 (emphasis added). The Court interpreted "prescribed by law" to mean "prescribed by legislative act." *Id.* at 425. Its first inquiry therefore was into whether any preexisting statutes "prescribed" such causes. *Id.* The Court explained that "[i]f there were, then the rule would apply that where causes of removal are specified by Constitution or statute, *as also where the term of office is for a fixed period*, notice and hearing are essential." *Id.* (emphasis added).

The Court thus recognized two distinct categories of officers who were entitled to notice and a hearing, and ultimately judicial review: a) officers *without* fixed terms whose causes of removal were prescribed by statute; and b) officers (such as Federal Reserve Board Governors) serving fixed terms. Because the commissioner challenging his firing in *Reagan* lacked fixed

2

tenure and thus did not qualify under the second category, the Court turned its attention to the first. It concluded that there were no statutes "prescri[bing]" causes of removal for commissioners, so commissioners—*unlike* officers serving fixed terms—were not entitled to notice and hearing. *Id.* And because those commissioners were not entitled to notice and a hearing, the court concluded that the firing judge's determination regarding cause was "a matter of discretion, and not reviewable." *Id.* at 425–26. By default, such officers were "removable at the will of the power appointing them." *Id.* at 425.

Critically, at-will officers lack the procedural protections held by officers with fixed statutory terms. For example, the "justices of the peace" in the jurisdictions where the commissioners operated, "[held] office for two years, and [could not] be removed except for cause and on *notice and hearing*." *Id.* at 426 (emphasis added). Because the commissioners held office "neither for life *nor for any specified time*," they were "within the rule which treats the power of removal as incident to the power of appointment, unless otherwise provided." *Reagan*, 182 U.S. at 426 (emphasis added).

Fixed-tenure is the critical factor distinguishing Federal Reserve Board Governors from at-will officers such as the commissioners in *Reagan*. The former were entitled to notice and a hearing and judicial review, while the latter were not. This distinction has a long pedigree. "Since before the Founding, offices held for a term of years, in the absence of constitutional or statutory language to the contrary, were designed to be inviolable." Lev Menand & Jane Manners, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 Colum. L. Rev. 1, 5 (2021). "When officers are appointed for a 'term of years' with the stipulation that the President may remove them for inefficiency, neglect of duty, or malfeasance in office [(INM)], the language that protects them from removal at pleasure is not INM—*it is the term of*

3

*years*." *Id.* (emphasis added).

The judicial reviewability of a fixed-tenured officer's right to office was a central question at issue in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803), which held precisely the opposite of what the Government argues here. The Court in *Marbury* analyzed whether there was a judicial remedy for an officer deprived of an office in which he held a vested legal interest. *Id.* Specifically, the Court considered whether judicial review was available to a justice of the peace— an officer holding a presidentially-appointed, Senate-confirmed position with a fixed term. And the Court "emphatically" concluded in the affirmative. *Id.* at 163. The Court explained that the fixed-tenured officer position at issue "has been created by special act of congress, and has been secured, so far as the laws can give security to the person appointed to fill it, for five years." *Id.* The deprivation of one's right to a legally vested office, the Court explained, was *not* "considered as a mere political act, belonging to the executive department alone, for the performance of which, entire confidence is placed by our constitution in the supreme executive; and for any misconduct respecting which, the injured individual has no remedy." *Id.* *Marbury* thus forecloses any possibility that the President's deprivation of one's right to a vested office is judicially unreviewable.[2]

Apart from failing to provide any authority for the novel proposition that a President's removal decision is unreviewable, the Government cannot point to any precedent indicating that a President's removal decision should be entitled to deference. Courts have traditionally shown

---

[2] Justice Thomas recently reiterated this conclusion. *See Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 198, n.2 (2023) (Thomas, J., concurring) ("In particular, the extent to which the judiciary reviewed actions and legal determinations of the executive depended on private right . . . . Even today, the distinction between public rights and private rights continues to inform this Court's understanding of Article III judicial power.") (cleaned up) (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)).

deference to the President in cases involving law enforcement or "military or diplomatic secrets," *United States v. Nixon*, 418 U.S. 683, 710 (1974), and "have been reluctant to intrude upon the authority of the Executive in military and national security affairs," *Department of Navy v. Egan*, 484 U.S. 518, 530 (1988), but that is because those are core executive functions under Article II. "As to these areas of Art. II duties the courts have traditionally shown the utmost deference." *Nixon*, 418 U.S. at 710. Not so for control of the Federal Reserve. "[T]he Fed's most important responsibility is administration of the money supply," (and resultingly, interest rates) and "unlike law enforcement, administration of the money supply is not an executive function." *Consumers' Rsch. v. CPSC*, 98 F.4th 646, 656 (5th Cir. 2024) (Oldham, J., joined by seven other judges, dissenting from denial of rehearing en banc).

The Government's argument that the President's decision to remove a Board Governor for cause is either unreviewable or entitled to significant deference cannot be squared with the Supreme Court's reasoning in *Trump v. Wilcox*. In the absence of meaningful judicial review to constrain a President from firing Governors for whatever "cause" he invents, the Federal Reserve is not actually an independent body in the "distinct historical tradition of the First and Second Banks of the United States." *Trump v. Wilcox*, 145 S. Ct. at 1415 (citing *Seila Law, LLC. v. CFPB*, 591 U.S. 197, 222 n.8 (2020)). The Federal Reserve's independence would come screeching to a halt, and the President would be handed blanket permission to unravel the foundations of "a unique institution with a unique historical background . . . a special arrangement sanctioned by history." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 467 n.16 (2024) (Alito, J., dissenting).

> **B. Congress Intended for the FRA's "For Cause" Removal Provision To Serve as a Limit on the President's Removal Power, Thus Giving Courts The Obligation and Power To Review.**

In enacting the Banking Act of 1935, ch. 614, tit. II, 49 Stat. 684, 703-23, Congress expressly rejected proposals that would have granted the President complete control over Federal

Reserve Board membership. The historical record illustrates Congress's specific intent to maintain the independence of the Federal Reserve from unfettered control of the President, and thus meaningful judicial review. The proposals to limit the Federal Reserve's independence were drafted by Federal Reserve Board Governor Marriner Eccles. They provided that the Federal Reserve Board Governors would serve at the pleasure of the President and could be removed at any time for any reason. *See* Gary Richardson & David W. Wilcox, *How Congress Designed the Federal Reserve to be Independent of Presidential Control*, 39 J. of Econ. Perspectives 3, 224 (2025). Eccles testified before a Senate Subcommittee to explain his view that

> [N]o man would stay on the Board if the President of the United States wished to appoint someone else in his place. . . . It seems to me to be immaterial whether a Governor has or has not a technical right to stay on the Board, if the President prefers to have someone else as Governor, because no person who is qualified for that position would choose to remain in these circumstances.

*Banking Act of 1935: Hearings on S.1715 and H.R. 7617 Before the S. Comm. on Banking & Currency*, 74th Cong. 282 (1935) (statement of Hon. Marriner S. Eccles, Governor, Fed. Rsrv. Bd.) (available at https://fraser.stlouisfed.org/files/docs/historical/senate/senate_bankact1935.pdf).

Not only did Congress expressly *reject* Eccles's proposal to allow the President unfettered power to remove Board members (Richardson & Wilcox, 39 J. of Econ. Perspectives at 227–28); Congress *added* numerous provisions to shield the Federal Reserve System from presidential pressure. *See, e.g.*, 12 U.S.C. § 242 (adding "for cause"); 12 U.S.C. § 241 (removing the Secretary of the Treasury and Comptroller of the Currency from the Board); 12 U.S.C. § 241 (providing for 14-year staggered terms). In fact, debate on the 1935 amendment illustrates that Congress contemplated that members of the Board would function with independence akin to Supreme Court justices. *See Banking Act of 1935: Hearings on S.1715 and H.R. 7617 Before the S. Comm. on*

6

*Banking & Currency*, 74th Cong. 408 (1935) (statement of Winthrop W. Aldrich, chairman the Chase National Bank of the city of New York) ("I think the ideal which has been most desired is to create a body in the Federal Reserve Board which would be similar to the Supreme Court of the United States and would be equally independent of any control.").

Given Congress's intense emphasis on the Federal Reserve Board's independence and the use of "for cause" as the removal standard, the President's power of removal cannot be as great as the Government now asserts, and courts remain the arbiter of determining whether "cause" exists.

## II.    PRESIDENT TRUMP'S PURPORTED BASIS FOR FIRING GOVERNOR COOK DOES NOT AMOUNT TO "CAUSE."

### A.    "For Cause" Is Best Construed to Mean the "Inefficiency, Neglect of Duty or Malfeasance" Standard the Supreme Court Set Out in *Humphrey's Executor* and Applied in Cases Since.

As the Court's articulated standard in *Humphrey's Executor* makes clear, removal "for cause" is best understood as a term of art that is limited to instances of "inefficiency, neglect of duty, or malfeasance in office" ("INM"). *Humphrey's Executor v. United States*, 295 U.S. 602, 620 (1935)). The Supreme Court has suggested that "for cause" and INM are synonymous. *See, e.g.*, *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 487 (2010) (defining "for cause" removal as "the *Humphrey's Executor* standard of 'inefficiency, neglect of duty, or malfeasance in office'"). And when addressing what "cause" could justify removal of a member of the U.S. Securities and Exchange Commission under a statutory scheme that did not provide any enumerated definition, the Supreme Court left untouched the parties' assumption that INM was the applicable standard. *See Free Enter. Fund*, 561 U.S. at 487; *SEC v. Bilzerian*, 750 F. Supp. 14, 16 (D.D.C. 1990) (citation omitted) ("[I]t is generally accepted that the President may remove a commissioner for inefficiency, neglect of duty, or malfeasance in office.").

Debate on the 1935 amendment to the FRA that reinstated the "for cause" standard

illustrates Congress's intent that the FRA's "for cause" removal provision be tied to the INM standard, articled just months prior by the Supreme Court in *Humphrey's Executor.* *See* Richardson & Wilcox, 39 J. of Econ. Persp. at 229 (2025). The for cause removal provision was originally enacted as part of the FRA in 1913 but removed after the Supreme Court's 1926 decision in *Myers v. United States*, 272 U.S. 52 (1926). While considering the 1935 amendment, "Senators and witnesses discussed [*Humphrey's Executor* and *Myers v. United States*, 272 U.S. 52 (1926)] . . . . Most thought . . . the Senate should wait for the court to hand down its decision in Humphrey's Executor before finalizing the language in the [Banking Act of 1935] legislation." *Id.* Ultimately, Congress did wait for the Court before amending the FRA. In May 1935, the Court published its decision in *Humphrey's Executor*, which confirmed the constitutionality of INM removal restrictions, expressly holding that Congress had the authority to "forbid the[] removal" of certain officers by the President "*except for cause.*" 295 U.S. at 629 (emphasis added). Three months later, Congress passed the Banking Act of 1935 to provide that the President could not remove Federal Reserve Board members except "for cause." 12 U.S.C. § 242. The most plausible reason that Congress used "for cause" rather than "INM" was that it was restoring the 1913 language of the FRA which, as explained below, took for granted that "for cause" meant INM.

Apart from INM, no other statutorily enumerated grounds for presidential removal of executive officers existed in the U.S. Code at the time of the FRA's enactment in 1913. Various other provisions of the current U.S. Code now contain specific grounds for presidential removal of government officials. *See, e.g.*, 22 U.S.C. § 4605(f) (member of the Board of the U.S. Institute of Peace can be removed "for conviction of a felony"); 28 U.S.C. 2996c(e) (member of the Board of the Legal Services Corporation can be removed "for offenses involving moral turpitude"). However, those additional reasons for presidential removal were not statutorily enumerated at the

8

time of the FRA's original enactment, and they cannot be incorporated after-the-fact into the pre-existing statute.[3]  In fact, by 1935, the *only* statutorily enumerated grounds for presidential removal of executive officers were INM (*see* Manners & Menand, 121 Colum. L. Rev. at 72–73 app. A, B (2021)), further confirming that Congress intended removal "for cause" to be limited to the INM standard announced in *Humphrey's Executor* just prior to the FRA's enactment.  And where Congress enacted "for cause" removal language during this era, it did so with respect to Article I *judges*, which further reinforces that the language carried significant protections.  *See, e.g.,* 31 Stat. 325 (judges in the Alaska territory); 34 Stat. 816 (judges for the U.S. Court for China).

The Supreme Court recently made clear that any "for cause" safeguards of agency independence must apply with particular force to the Federal Reserve.  "The Federal Reserve is a uniquely structured, quasi-private entity that follows in the distinct historical tradition of the First and Second Banks of the United States."  *Trump v. Wilcox*, 145 S. Ct. at 1415.  The Court in *Trump v. Wilcox* permitted the removals of a member of the National Labor Relations Board and a member of the Merit Systems Protection Board to take effect but specifically distinguished the removal protections for Federal Reserve Governors because of the unique necessity, recognized by a long history, of an independent Federal Reserve Board.  *Id*.  The "for cause" statutory removal provision provided by the FRA is essential to protecting this independence.

In 1972, the Federal Reserve's longtime General Counsel, Howard Hackley, explained that "[p]resumably, a Board member, like a member of the Interstate Commerce Commission, cannot be removed by the President except for 'inefficiency, neglect of duty, or malfeasance in office.' Since the enactment of the original [Federal Reserve] Act – a period of nearly 60 years – no

---

[3] Even *if* the later-enumerated bases for removal could somehow be included in the FRA's definition of cause, the conduct President Trump cited for his decision would not satisfy even those additional grounds.

President has attempted to remove a member of the Board.'" Howard Hackley, *The Status of the Federal Reserve System in the Federal Government*, 50 (1972). The first part of Hackley's statement—that the FRA's "for cause" removal provision means INM—remains true. Unfortunately, the second part of his statement no longer does.

To be sure, in *Collins v. Yellen*, 594 U.S. 220, 255 (2021), the Supreme Court stated that the "for cause" removal restriction for the FHFA Director "appears" to give the President more removal authority than statutes specifying particular bases for removal. But the Court had no occasion to definitively interpret what causes the statute encompassed because it held the Director must be removable at will. And while various statutes delineated multiple different grounds for removal when the FHFA was created in 2008—and thus could be understood to be incorporated as "cause" under that statute—INM appears to have been the *only* statutory basis for removal in existence when the Federal Reserve Board was created in 1913. That "distinct historical tradition" governs the proper understanding of the "for-cause removal protections for members of the Federal Reserve's Board of Governors." *Trump v. Wilcox*, 145 S. Ct. at 1415.

### B. Based on Dictionary Definitions of the Word "Cause," the Government's Position Grants the President More Authority to Remove Members of the Federal Reserve Board than Almost All Other Independent Agencies.

Rejecting the INM standard, the Government argues that cause is simply "any articulable justification that the President deems sufficient," except for "mere policy disagreement[s]." Gov't Br. at 10. This position leads to an absurd conclusion—namely, that the President has dramatically *more* power to remove members of the Federal Reserve Board than he does with almost all other independent agency officials, even though the Court has repeatedly recognized the uniquely independent status of the Federal Reserve Board. *See, e.g.*, *Seila Law*, 591 U.S. at 222 n.8; *Trump v. Wilcox*, 145 S. Ct. at 1415; *see also CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. at 467 n.16 (Alito, J., dissenting) ("The [Federal Reserve] Board, which is funded by the earnings of

10

the Federal Reserve Banks, 12 U. S. C. §§243, 244, is a unique institution with a unique historical background"), Brett M. Kavanaugh, *Separation of Powers During the Forty-Fourth Presidency and Beyond*, 93 Minn. L. Rev. 1454, 1474 (2009) ("in some situations it may be worthwhile to insulate particular agencies from direct presidential oversight or control—the Federal Reserve Board may be one example").[4]  The Government's position cannot be right.

Moreover, the Government's concession that "cause" cannot encompass "mere policy disagreement" itself demonstrates that "cause" is not limited to "contemporary dictionary definitions."  *See* Gov't Br. at 10 ("[W]hen Congress enacted the FRA in 1913, 'cause' was ordinarily understood to mean a 'motive or reason,' Wharton's Law-Lexicon 150 (11th ed. 1911), or 'ground of action,' Black's Law Dictionary 178 (2d ed. 1910).").  The Government's argument only works if the relied upon dictionary definition also specifically states that a "mere policy disagreement" also is not cause.   It does not.

Given that the Government has conceded that cause has *some* limits beyond those imposed by the term's dictionary definition, it is not clear why the only limit should be policy disagreements.  The more logical interpretation, which is moored to traditional understandings of "cause" in the U.S. Code during the relevant time period, legislative history, judicial interpretations of "cause," and the Supreme Court's repeated recognition of the Federal Reserve's unique independence, is that "for cause" is a legal term of art that cannot be defined by looking up the

---

[4] *See, e.g.*, 42 U.S.C. § 7171(b)(1) (INM standard for Federal Energy Regulatory Commissioners); 46 U.S.C. § 46101(b)(5) (INM standard for Federal Maritime Commissioners); 15 U.S.C. § 41 (INM standard for Federal Trade Commissioners); 49 U.S.C. § 1301(b)(3) (INM standard for Surface Transportation Board members); 30 U.S.C. § 823(b)(1) (INM standard for Federal Mine Safety and Health Review Commissioners); 42 U.S.C. § 5841(e) (INM standard for Nuclear Regulatory Commissioners); 49 U.S.C. § 1111(c) (INM standard for National Transportation Safety Board members); *see also* Manners & Menand, 121 Colum. L. Rev. at 72–73 app. A (2021) (listing spectrum of agency removal protections).

word "cause" in the dictionary. Instead, when Congress used the term "cause," it adopted the background conception of that term under the law at the time—which was INM.

### C.  Private Conduct Before Taking Office Could Not Amount to "Cause," and There are Other Remedies for Such a Circumstance.

Because the prevailing understanding of "cause" at the time the FRA was enacted encompassed almost exclusively conduct undertaken in the course of office, pre-office conduct was generally not grounds for removal. The canonical English case of *Rex v. Richardson*, 1 Burrows, 517, 538 (1758), authored by Lord Mansfield, informed American courts' understandings of which non-office (and therefore, pre-office) conduct amounted to removable cause at the time of the FRA's enactment. That category of offenses was vanishingly small. It included only misconduct "(1) Such as have no immediate relation to his office, but are in themselves of *so infamous a nature, as to render the offender unfit to execute any public franchise*." *State ex rel. Atty. Gen. v. McLain*, 58 Ohio St. 313, 320 (1898) (quoting *Rex v. Richardson*, 1 Burrows at 538) (emphasis added). In the decades surrounding the FRA's enactment, no fewer than eight state supreme courts cited *Rex v. Richardson* in defining removable cause. *See id.*; *Richards v. Town of Clarksburg*, 4 S.E. 774, 779 (W. Va. 1887); *Legault v. Bd. of Trs. of City of Roseville*, 118 P. 706, 707 (Cal. 1911); *In re Koch*, 257 N.Y. 318, 326, 178 N.E. 545, 547 (1931); *Haight v. Love*, 39 N.J.L. 14, 22 (Sup. Ct. 1876); *State ex rel. Behan v. Judges of Civ. Dist. Ct. of Par. of Orleans*, 35 La. Ann. 1075, 1080 (1883); *Ellison v. Raleigh*, 89 N.C. 125, 127 (1883); *State v. City of Ballard*, 10 Wash. 4, 7, 38 P. 761, 762 (1894). Setting aside the fact that Governor Cook did not *ever* commit mortgage fraud, any such pre-office offense plainly would not have been "so infamous a nature, as to render the offender unfit to execute any public franchise." *Rex*, 1 Burrows at 538.

Pre-office conduct is addressed through the vetting process and impeachment. A thorough

12

vetting by both the President appointing the nominee and the Senate before voting on confirmation should bring to light any pre-office conduct. This allows the nominee to address the allegation to the individuals responsible for their placement on the Board, and removes the incentive to sit on evidence of pre-office conduct to be used for a subsequent administration to remove. And if pre-office conduct comes to light only after the vetting and confirmation process, members of the Federal Reserve Board can be impeached. U.S. Const. art. II, § 4.

> **D. Even If Pre-Office Conduct Were Considered Against the Broadest Definition Of "Cause," The Allegation On Which President Trump Took His Action Would Not Amount To "Cause."**

The Government mistakenly argues that Governor Cook's alleged conduct—making "contradictory representations on financial documents with no explanation given" (8/29/25 Hr'g Tr. 62:10–12; *see also id.* at 61:9–10, *id.* at 61:19-20)—amounts to adequate "cause" for the President's action. *See also* Gov't Br. at 12 (even "if [contradictory representations] were made inadvertently, they still demonstrate lack of care or negligence").[5] Even if the President's authority to remove a Board member "for cause" was to comprise a limited set circumstances beyond INM in office (which should not be the case as none existed at the time the FRA was enacted), such as "any of the recognized removal causes contained in the U.S. Code, including INM, immorality, ineligibility, offenses involving *moral turpitude*, and *conviction of a crime*," that standard is clearly not met here. Manners & Menand, 121 Colum. L. Rev. at 6 (emphases added).

The "contradictory representations" allegedly made by Governor Cook on her financial documents are not offenses of "moral turpitude" or criminal convictions. Instead, they are

---

[5] Director Pulte even posted on *X* allegedly "matching signatures" on two property records to suggest a facial contradiction—albeit ignoring when the applications were made, definitions of different document sections, and if adjustments were later made to the mortgages or refinancing. *See* William Pulte (@pulte), X (Aug. 31, 2025), https://x.com/pulte/status/1962191967531737415.

unsubstantiated, untested, and unaddressed allegations.  If such unfounded allegations were enough to justify removal for "cause," then the President could fire a Board member over mere policy disagreements—including the timing and/or amount of an interest rate drop.  But, as the Government concedes, that is not the law.

Moreover, the asserted basis for Governor Cook's removal suffers from another legal infirmity: the Government has long known about the alleged facial inconsistencies in Governor Cook's financial documents.  At the August 29, 2025 hearing, the Government conceded that "if it was something that was *known at the time*, it's much harder to say that it's cause later because the presumption is that has gone through the political process and a judgment has been made." 8/29/25 Hr'g Tr. 66:4–8 (emphasis added).  Governor Cook's alleged "contradictions" were included in documents disclosed to the White House before she was appointed by the President and confirmed by the Senate.  During her Senate confirmation process, Governor Cook submitted questionnaires and provided reports that would have revealed the same purported "facial" contradictions the Government now claims are "cause" to fire her.  A proper hearing would demonstrate that the Government had prior knowledge of the alleged facial contradictions in Governor Cook's documents well before the President invoked them as the basis for her purported removal.[6]  As the Government rightly acknowledges, such pre-office conduct "that was known at

---

[6] For example, at a proper opportunity to be heard, the SF-86 Supplemental Questionnaire submitted to the Government would show that Governor Cook listed the Michigan address as a "primary residence" and the Georgia address as a "2nd home."  Then, Governor Cook's Electronic Questionnaire for Investigations Processing (e-QIP) submitted would show the Georgia address listed as her "present" residence, the Michigan address as her "present" residence and "current permanent residence," and Massachusetts as her "present residence" but which "is now a second home and rental property."  Further, Governor Cook's Nominee Report, U.S. Office of Government Ethics Form 278e, would list mortgage designations (as "Mortgage on Personal Residence") for each of the relevant properties.  If those are facial contradictions, as the Government and President claim, they certainly existed in the materials that Governor Cook

the time" likely cannot constitute a legitimate basis for President Trump's removal of Governor Cook.

On this record, the Court need not reach the question of pretext. But the Court may consider whether the asserted basis for removal is pretextual in assessing the merits of Governor Cook's claim. In that regard, even if, on its face, "making contradictory representations on financial documents" were adequate "cause" for removal (8/29/25 Hr'g Tr. 62:10–11), the uncontradicted public record demonstrates this was *not* the real reason for Governor Cook's purported removal. The Government offers only back-of-the-hand treatment to the argument that the President's rationale for purportedly removing her was pretext, and even goes so far as to claim, "[Governor] Cook offers nothing but speculation to support her charge of insincerity." Gov't Br. at 16. At oral argument, the Government claimed it is "not aware of any statements the President ever made about [Governor] Cook" and "[t]here's nothing in the President's statements, either contemporaneous or after, that suggests that the removal was for any reason other than the reason given in the letter." 8/29/25 Hr'g Tr. at 60:2–3, 60:7–9. The Government is decidedly incorrect.

Pretext—whether by the President or others in his Administration—can be inferred from the President's targeted ire at Governor Cook, others on the Federal Reserve Board, or the Board as a whole.[7] The public record is replete with his comments demanding that the Board, including

provided as part of her Presidential vetting and Senate Confirmation process—for which Senators or White House advisors could have inquired of her about any alleged "facial inconsistencies."

[7] The Government relies on *Trump v. Hawaii*, 585 US 667 (2018), to argue that this Court cannot probe into pretext. But the Supreme Court's reticence "look behind" in that case stemmed from the unique context of a facially neutral "national security directive regulating the entry of aliens abroad," *id.* at 702, whereas this case involves a targeted decision about a single individual's continued service as a Federal Reserve Governor. The more analogous case is *Dep't of Com. v. New York*, 588 U.S. 752, 782–85 (2019), in which the Court found pretext because of the disconnect between the agency's stated enforcement rationale and the actual facts on the ground. The Court concluded that the "explanation for agency action [] is incongruent with what the record

Governor Cook and its other members, lower interest rates or face consequences in 2025. *See* ECF 2-1 "Cook Br." at 12–13. As the Government concedes, "generally speaking, the rule is we *look at what the President has said* and we evaluate it on its own terms." 8/29/25 Hr'g Tr. 60:22–24 (emphasis added). Here, the President's comments—evaluated on their face—confirm that his stated reason for removing Governor Cook was mere pretext.

In May 2025, the President demanded "THE FED SHOULD CUT RATES SOONER, RATHER THAN LATER" and harshly criticized Chairman Powell.[8] In June, the President criticized the Board as a whole for "refusing to lower the Rate" and stated, "THE BOARD SHOULD ACTIVATE."[9] And then in July—only a month before Director Pulte's referral and the President's purported removal for "cause"—President Trump attacked the Board again, stating "the Fed Board has done nothing to stop this 'numbskull' from hurting so many people. In many ways the Board is equally to blame!"[10] and "[t]he Board should act, but they don't have the Courage to do so!"[11] President Trump continued his public rebuke of and policy disagreement with the Board, posting three times on August 1, 2025 about lower rates, including "The Economy is BOOMING . . . despite a Fed that also plays games, this time with Interest Rates."[12] These statements against Chairman Powell, the Board, and then Governor Cook reveal the true

---

reveals about the agency's priorities and decision making process.". *Id.* at 785. The same incongruency exists here.

[8]    Donald Trump (@realDonaldTrump), Truth Social (May 17, 2025, 11:11 AM), https://truthsocial.com/@realDonaldTrump/posts/114523811882470999.

[9]    Donald Trump (@realDonaldTrump), Truth Social (June 24, 2025, 1:32 AM), https://truthsocial.com/@realDonaldTrump/posts/114736702510423652.

[10]    Donald Trump (@realDonaldTrump), Truth Social (July 18, 2025, 6:45 AM), https://truthsocial.com/@realDonaldTrump/posts/114873827864802531.

[11]    Donald Trump (@realDonaldTrump), Truth Social (July 23, 2025, 9:08 AM), https://truthsocial.com/@realDonaldTrump/posts/114902704048179740.

[12]    Donald Trump (@realDonaldTrump), Truth Social (Aug. 1, 2025, 2:09 PM), https://truthsocial.com/@realDonaldTrump/posts/114954846612623858.

motivation for the President's action: his disagreement with Governor Cook's policies as a member of the Board.

The Court should accept the Government's invitation to "look at what the President has said and … evaluate it on its own terms."  And when it does, the evidence of the real reason for Governor's removal should be clear.  President Trump has accused Governor Cook of "potential" fraud as a private citizen—to find "cause" to purportedly remove her—so that he could achieve his stated goal to have a "majority" of members he appointed to the Board.  That is precisely the sort of policy disagreement the Government agrees cannot constitute viable "cause" within the meaning of the FRA.  *See* Gov't Br. at 10 ("mere policy disagreement does not suffice" as "cause"); *see also* 8/29/25 Hr'g Tr. 55:24–56:2 (MR. ROTH: "I think if you're within the realm of reasonable policy disputes, the Supreme Court has told us that's not cause . . . and we're not disputing that here.").  At bottom, the allegedly contradictory statements in Governor Cook's financial forms are nothing but pretext to remove her based on a policy dispute.

### III.    GOVERNOR COOK HAD A RIGHT TO PROPER NOTICE AND A MEANINGFUL OPPORTUNITY TO BE HEARD PRIOR TO BEING FIRED.

#### A.  By Providing for Removal Only "For Cause," The FRA Grants Governor Cook a Statutory Right to Notice and a Hearing.

Even assuming, however, that the President's stated reasons could satisfy the "for cause" standard, his purported firing would still be unlawful.  The Supreme Court has made clear that for-cause removal provisions require notice and a hearing before an official may be removed.  The Government's contrary arguments badly misunderstand those precedents.

The critical cases are *Reagan* and *Shurtleff v. United States*, 189 U.S. 311 (1903).  In *Reagan*, the Court recognized a "rule" that "where causes of removal are specified by constitution or statute, as also where the term of office is for a fixed period, notice and hearing are essential." 182 U.S. at 425.  In *Shurtleff*, the Court reiterated that rule, writing (in the context of an INM

17

statute) that "if the removal is sought to be made for those causes, or either of them, the officer is entitled to notice and a hearing." 189 U.S. at 314. This hearing requirement, the Court explained, served the critical function of ensuring that the President was *actually* removing the officer for the causes specified by statute: "if a removal is made without such notice, there is a conclusive presumption that the officer was not removed for any of those causes, and his removal cannot be regarded as the least imputation on his character for integrity or capacity." *Id.* at 317.[13] These cases reflect and reiterate a preexisting common law understanding that "the power of removal can not, except by clear statutory authority, be exercised without notice and hearing, but that the existence of the cause, for which the power is to be exercised, must first be determined after notice has been given of the charges made against him, and he has been given an opportunity to be heard in his defense." Floyd R. Mechem, *A Treatise on the Law of Public Office and Officers* § 454, at 287 (1890); *see, e.g.*, *Ham v. Board of Police of the City of Boston*, 142 Mass. 90, 96 (1886); *Biggs v. McBride*, 21 P. 878, 881 (Ore. 1889); *New Jersey ex rel. Haight v. Love*, 39 N.J.L. 14, 21-22 (1876).

Together, *Shurtleff* and *Reagan* require notice and a hearing when a President seeks to remove an official with for-cause-removal protections. As Justice Breyer put it, "we have previously stated that *all* officers protected by a for-cause removal provision and later subject to termination are entitled to 'notice and [a] hearing.'" *Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 536 (2010) (Breyer, J., dissenting) (citing *Reagan* and *Shurtleff*). As Judge Griffith explained, "[i]t appears well-settled that an officer with removal protection is

---

[13] Both *Reagan* and *Shurtleff* involved statutes dealing with federal officers, not employees, and the officer in *Shurtleff* was a principal officer. No hearing was necessary in *Reagan* because Congress had not specified any causes, *see supra* Section I.A, or in *Shurtleff* because the Court held that the officer, who had no fixed term, could be removed for causes other than those specified in the statute, *see* 189 U.S. at 317.

entitled to notice and some form of a hearing before removal." *PHH Corp. v. CFPB,* 881 F.3d 75,

135 (D.C. Cir. 2018) (Griffith, J., concurring) (citing *Reagan* and *Shurtleff*).

The Government's attempt to resist this "well-settled" rule fails.  The Government asserts

that one has no statutory right to notice and a hearing unless those specific protections are "very

clear and explicit," and that Governor Cook is not entitled to notice and a hearing because the

Federal Reserve Act does not use the words "notice and a hearing."  Gov't Br. at 19.  But neither

did the statutes in *Shurtleff* or *Reagan*, and so the Government's distinction of those cases is no

distinction at all.  Nor does it help the Government to claim that *Reagan* and *Shurtleff* are

inapposite because they apply only "where causes of removal are specified."  *Id.* (quoting *Reagan*,

182 U.S. at 425).  As already explained, the Federal Reserve Act does specify causes of removal—

as the Government necessarily admits by conceding that the President could not remove Governor

Cook due to mere policy disagreement.  *See supra* Section II.B.  There is no basis to take this case

outside of *Reagan* and *Shurtleff*'s "rule" requiring notice and a hearing.

### B. Given the Historic and Unique Status of the Federal Reserve Board, Its Governors Have a Property Right Leading To a Due Process Right To Notice and Hearing

The same conclusion follows from the Due Process Clause.  As an officer with for-cause

removal protection, Governor Cook has a property interest in her position.  The Government's sole

response is to claim that because Governor Cook is an *officer* of the United States, not "a mere

public employee," she "ha[s] no property interest in her public office and was thus owed no notice

or opportunity to be heard." Gov't Br. at 18.  That is wrong in multiple respects.

First, the Government's theory is foreclosed by the foundational precedent of *Marbury v.

Madison*, 5 U.S. (1 Cranch) 137 (1803). At issue in that landmark ruling was the validity of

William Marbury's presidential appointment as justice of the peace—an *officer* position requiring

Presidential appointment and Senate confirmation (a "PAS" office). *Marbury* makes plain that the

critical distinction with regard to a property right is whether the holder of a position serves *at will*, not whether she is an officer or employee. As Chief Justice Marshall explained:

> Where an officer is removable *at the will of the executive*, the circumstance which completes his appointment is of no concern; because the act is at any time revocable; and the commission may be arrested, if still in the office. But when the officer is *not removable at the will of the executive*, the appointment is not revocable, and cannot be annulled. It has conferred *legal rights which cannot be resumed*.

*Id.* at 162 (emphasis added). The office of justice of the peace—like Federal Reserve governor—was that of an *officer*. *Wise v. Withers*, 7 U.S. (3 Cranch) 331, 335–36 (1806) (holding that D.C. justices of the peace were "officers of the government of the United States" under a militia exemption statute). A justice of the peace had a statutorily-defined term limit of five years, and, as the Court in *Marbury* concluded, the "appointment conferred on him a *legal right to the office for the space of five years*." 5 U.S. (1 Cranch) at 168 (emphasis added).

The cases the Government cites in support of its proposed "officer/employee" distinction lend no support to its theory. None of those cases cast doubt upon *Marbury*'s enduring conclusion that a PAS officer with for-cause removal protection has a vested property interest in her role. Rather, as the Supreme Court explained in *Glidden Co. v. Zdanok*, the cases the Government cites stand for the proposition that "it is settled that neither the tenure nor salary of federal officers is constitutionally protected from *impairment by Congress*." 370 U.S. 530, 534 (1962) (emphasis added). That conclusion makes sense and is entirely consistent with the notion that PAS officers with for-cause removal protection enjoy a property interest in their positions. As the Court put it in *Cleveland Bd. of Educ. v. Loudermill*, "property interests are not created by the Constitution, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source" such as a statute. 470 U.S. 532, 538 (1985) (internal citation and quotation marks omitted). The "statute . . . creates such an interest." *Id.* Thus, by repealing or

amending the very statute that gives rise to a property right—here, the Federal Reserve Act—a legislature may eliminate that right. The Fifth Amendment's Due Process clause does not stand in the way of Congressional action in that scenario. But it does prevent the *President* from unilaterally terminating a property right conferred by statute.

The Government's other cases are even further afield. *Crenshaw v. United States* held only that an *employee*—a cadet midshipman *without "for cause" removal protection*—lacked "any vested interest or contract right in his office *of which congress could not deprive him*." 134 U.S. 99, 104 (1890) (emphasis added). *Crenshaw* is thus inapposite for multiple reasons. And *Butler v. Pennsylvania*, 51 U.S. 402, 403 (1850), held that the Pennsylvania legislature could reduce the salaries of those canal commissioners without violating Article I, Section 10 of the Constitution—a question entirely irrelevant to the case at hand. *Id.* at 418. Finally, *Taylor v. Beckham,* 178 US 548 (1900), and *Baker v. Carr*, 369 US 186 (1962), considered whether *candidates for elected office*—not PAS officers with for-cause removal protections—had a property right to "public office." *Baker,* 369 U.S. at 232. Governor Cook is not a losing candidate for office; she is a public official protected by removal for cause.

At the hearing, the Government asserted that "for constitutional purposes the relevant distinction is not elected versus appointed . . . It's between officers and employees. That's the distinction that comes up over and over again in the case law." 8/29/25 Hr'g Tr. 69:23–70:2. But the Government has not cited to a case, either in its briefs or at oral argument that even hints at such a distinction. Nor does the Government provide support for its theory that "you have principal officers and inferior officers and then employees . . . the way I see it, the higher you get through that, the lower the standard of sort of any procedural due process protections that apply." *Id.* at 70:3–9. There are obvious reasons why the Government would like to see it that way, but that

vision does not appear to have emerged from any United States Reporter or section of the United States Code.

Because Governor Cook possesses a property interest in her position on the Board, and again with reference to the historic pedigree and special importance of the independence of the Board and its Governors (*see supra* Section II.B), the Due Process Clause guarantees that she cannot be removed without—at a minimum—"oral or written notice of the charges against [her], an explanation of the employer's evidence, and an opportunity to present [her] side of the story." *Loudermill*, 470 U.S. at 546. And critically, both the Supreme Court and D.C. Circuit have instructed that any such hearing must take place "*prior* to the discharge of an employee." *Id.* at 542 (emphasis added); *Esparraguera*, 101 F.4th at 40 (same).

## IV. THE EVENTS BEFORE PRESIDENT TRUMP PURPORTEDLY FIRED GOVERNOR COOK DO NOT AMOUNT TO PROPER NOTICE AND A HEARING

### A. President Trump's Reliance on the FHFA Criminal Referral Communicated by Social Media Post is Not Adequate Notice

Governor Cook did not receive pre-termination notice and hearing in this case. Rather, on August 20, 2025, FHFA Director Pulte—using social media as the vehicle to publicize his actions five days earlier—sent the referral letter to DOJ accusing Governor Cook of mortgage fraud and false representations (and attaching exhibits). Just thirty minutes after Director Pulte's post, President Trump went on his social media to demand that Governor Cook resign immediately.[14] Governor Cook learned of these developments only through the grapevine—no government official gave her notice of these *Truth Social* posts.

This government-by-post cannot amount to proper notice. For starters, neither Director

---

[14] Donald Trump (@realDonaldTrump), Truth Social (Aug. 20, 2025, 8:31 AM), https://truthsocial.com/@realDonaldTrump/posts/115061104213677946.

Pulte's post nor the Government's response states that the President was considering removing Governor Cook from the Board for cause. The possibility of such removal is the "notice" to which Governor Cook was entitled, and that the Government never argues she received.

Worse, the referral letter's equivocal language makes clear that the charges against Governor Cook were nothing more than a set of cherry-picked, cut-and-paste allegations to try to give the President political cover to remove a Board member with whom he has policy disagreements. The August 15 letter uses words like "it appears," "potentially committing," and "to potentially secure" to claim cause for removal. ECF 1-2. No specifics were ever provided to Governor Cook, regardless of the unsubstantiated claims leveled against her by Director Pulte and President Trump on *Truth Social* and in the media. And when asked about the referral allegations, President Trump stated, "she *seems* to have had an infraction" and it "doesn't *seem* like" Governor Cook was following the rules. Cook Br. at 8. And Director Pulte taking to social media to selectively publish allegedly "matching signatures" on records, and drawing arrows in between them as if that reveals anything at all, is nothing more a partisan stunt to rile up his online followers.[15] It is not legitimate notice of any kind, and such ambivalent language cannot serve as notice of alleged wrongdoing.

### B. Governor Cook Was Not Given Any Actual Opportunity To Be Heard

The Government also argues Governor Cook was afforded an "ample opportunity" to respond to the allegations that the President contends were the basis for his decision. Gov't Br. at 20. That is obviously not so. The fact that the President added, "Cook must resign, now!!!" to his *Truth Social* post on August 20 (above a *Bloomberg* news story about Director Pulte's referral

---

[15] William Pulte (@pulte), X (Aug. 28. 2025), https://x.com/pulte/status/1961092716927852704.

letter) hardly gave notice that he planned to *remove* the Governor for cause, and certainly neither

that post, nor the President's off-hand remark to reporters two days later that "I'll fire her if she

doesn't resign," offered any invitation to Governor Cook that she had an "opportunity to defend"

(here in  matter of a few days) against the allegations, *Shurtleff*, 189 U.S. at 317, before the

President would remove her. *Compare* Aditya Bamzai, *Taft, Frankfurter, and the First*

*Presidential For-Cause Removal*, 52 U. Richmond L. Rev. 691, 729–37 (2018) (describing the

elaborate process President Taft prescribed before he was to determine whether to remove two

members of the Board of General Appraisers "for cause," including establishment of a "committee

of inquiry" that included Felix Frankfurter that would report to the President).

Moreover, President Trump posted "Cook must resign, now!!!" just *thirty* minutes after

Director Pulte published the referral letter online on August 20.  Cook Br. at 7; 8/29/25 Hr'g Tr.

80:9–13.  Half an hour is hardly an opportunity to read and digest the letter, let alone be heard.

And then, rather than ask her to answer the charge, to provide further information, or to submit a

written explanation, the President, two days after the referral, told reporters that he will *fire*

Governor Cook "if she doesn't resign."  Calling for her "firing" if she does not immediately resign

offers neither an opportunity to contest the allegations nor a deadline to respond to the claims in

any meaningful way.

To be clear, preliminary civil papers seeking emergency relief to preserve her job status

are not the place for a proper presentation of the facts or a chance to be heard.  Nor does the

Constitution require Governor Cook to take to social media to keep her job.  Rather, the Federal

Reserve Act and Due Process Clause required the government to give Governor Cook the

opportunity (including a reasonable time to respond, in writing or otherwise) to address the

allegations and underlying evidence either with the Federal Reserve, the FHFA, the White House

Counsel, or another Governmental entity.  Through that process, Governor Cook would have had the chance to address the purportedly "facial contradictions" (which , again, the Government knew during Governor Cook's confirmation and vetting process).  *See supra* Section II.C.

## V.    THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF FAVOR GOVERNOR COOK'S REQUEST FOR RELIEF.

### A.  Given The Unique Role of Federal Reserve Governors and The Allegation of Fraud, Removal Without Proper Procedures Would Cause Her Irreparable Harm.

The Government asserts that the unprecedented removal of a Federal Reserve Governor should be treated like a run-of-the-mill employment case.  *See* Gov't Br. at 25.  To the contrary, this case presents a "genuinely extraordinary situation" in which "the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, . . . so far depart from the normal situation that irreparable injury might be found."  *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974).

To start, preventing Governor Cook from discharging her duties as a Federal Reserve Governor itself constitutes irreparable harm.  In most employment cases, there is a background presumption that jobs are fungible and that the loss of a job can be remedied through "back pay and time in service credit."  *Farris v. Rice*, 453 F. Supp. 2d 76, 79 (D.D.C. 2006).  This background presumption does not apply to Governor Cook, a Senate-confirmed officer who has sworn an oath to ensure the stability of the U.S. financial system.  There is no remedy at law—whether backpay or something else—that can redress the harm she will suffer if she is unable to carry out her obligations to the American people.

The Government's reliance on *Dellinger v. Bessent*, 2025 WL 887518 (D.C. Cir. Mar. 10, 2025), is misplaced.  *See* Gov't Br. at 24–25.  The court in *Dellinger* explained that the wrongful removal of Special Counsel Dellinger would not constitute irreparable harm because "*at worst,*

*Dellinger would remain out of office for a short period of time.*" *Id.* at *4 (emphasis added). Not so here. The President has indicated he will attempt to confirm Governor Cook's permanent replacement swiftly, stating, "we have some very good people for that position" and "[w]e'll have a majority very shortly."[16] And specifically, the President has identified Stephen Miran, whose nomination to fill a different Board seat has *already been submitted to the Senate*, as a viable replacement for Governor Cook: "We might switch him to [Cook's seat]—it's a longer term."[17] As the D.C. Circuit has explained, "[t]hat could mean that, at the end of the litigation, there would be no seat available for which [Cook] could serve as even the de facto occupant." *Severino v. Biden*, 71 F.4th 1038, 1043 (D.C. Cir. 2023). This case is thus entirely different from *Dellinger* where, "at worst," the Senate-confirmed officer "would remain out of office for a short period of time." 2025 WL 887518 at *4.[18]

Additionally, *Dellinger* is a "non-precedential order" that this court has consistently declined to endorse or extend. *Aviel v. Gor*, 780 F. Supp. 3d 1, 14 (D.D.C. 2025). "Almost every court to address the question in the recent slew of wrongful removal cases has agreed that this harm meets the irreparable threshold." *Slaughter v. Trump*, 2025 WL 1984396, at *17 (D.D.C. July 17, 2025) (AliKhan, J.) (citations omitted). In numerous post-*Dellinger* cases, this Court has reiterated that the injury is irreparable where plaintiffs "have been removed from a presidentially appointed and congressionally confirmed position of high importance[,] both they and the . . .

---

[16] Brian Schwartz, *Trump Weighs Quickly Announcing Nominee to Replace Lisa Cook on Fed Board*, Wall St. J. (Aug. 26, 2025), https://www.wsj.com/politics/policy/trump-weighs-quickly-announcing-nominee-to-replace-lisa-cook-on-fed-board-491aea2a?st.

[17] *Id.*

[18] After firing of Special Counsel Dellinger, President Trump waited nearly four months to nominate a replacement. *See* Tom Dreisbach, *Trump nominates official with ties to antisemitic extremists to lead ethics agency*, NPR (May 30, 2025), https://www.npr.org/2025/05/30/nx-s1-5417902/trump-ingrassia-antisemitism-ethics.

Board have been deprived of the ability to carry out their congressional mandate." *Harper v. Bessent*, 2025 WL 2049207, at \*13 (D.D.C. July 22, 2025) (Ali, J.) (internal citations and quotation marks omitted). *See LeBlanc v. United States Priv. & C.L. Oversight Bd.*, 2025 WL 1454010, at \*32 (D.D.C. May 21, 2025) (Walton, J.); *Grundmann v. Trump*, 770 F. Supp. 3d 166, 187 (D.D.C. 2025) (Sooknanan, J.). The only decisions to reach contrary conclusions involved officials who *lacked* statutory for-cause removal protections and therefore had no property rights—and consequently, no due process rights—in their positions. *See Brehm v. Marocco*, 2025 U.S. Dist. LEXIS 71326, at \*8 (D.D.C. Mar. 11, 2025) (removal of head of the United States African Development Foundation); *Perlmutter v. Blanche*, 2025 WL 2159197, at \*7 (D.D.C. July 30, 2025) (removal of Register of Copyrights and Director of the U.S. Copyright Office at the Library of Congress). As *Dellinger* emphasized, "a stay is an exercise of judicial discretion and the propriety of its issue is dependent upon the circumstances of the particular case." 2025 WL 887518, at \*4 (citations and quotation marks omitted). Here, the circumstances plainly amount to irreparable harm under this Court's precedents.

Even if the loss of her position as Federal Reserve Governor was not by itself irreparable harm, the President's for-cause removal of Governor Cook inflicts irreparable reputational and stigmatic harm. In a related context, the D.C. Circuit has made clear that the "combination of an adverse employment action and 'a stigma or other disability that foreclose[s] [the plaintiff's] freedom to take advantage of other employment opportunities'" implicates critical liberty interests. *O'Donnell v. Barry*, 148 F.3d 1126, 1140–41 (D.C. Cir. 1998) (citing *The Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972). Unlike Special Counsel Dellinger or any other principal officer the President has attempted to fire, Governor Cook has been targeted under the auspices of alleged wrongdoing. These allegations pose a serious risk of tarnishing her standing

among economists and the American public and making it impossible to take advantage of other employment opportunities in the future. Indeed, there is a risk that the Federal Reserve could itself refuse to reinstate Governor Cook on the basis of these allegations. The only way to clear the cloud over her name is an order that immediately reinstates her to her position. No amount of backpay will suffice.

This case is also extraordinary because Governor Cook has been deprived of statutorily and constitutionally guaranteed process. "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Indeed, as the Supreme Court has explained compensatory damages typically are not available to redress a deprivation of process. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 (1986). Accordingly, this court has repeatedly held that denial of due process rights under the Fifth Amendment amounts to irreparable harm for which there is no adequate remedy at law. *See, e.g.,* Gordon *v. Holder*, 826 F. Supp. 2d 279, 296 (D.D.C. 2011); *Goings v. Court Servs. & Offender Supervision Agency*, 786 F. Supp. 2d 48, 78–79 (D.D.C. 2011); *Simms v. D.C.*, 872 F. Supp. 2d 90, 104–05 (D.D.C. 2012); *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 217–18 (D.D.C. 2020). Here, Governor Cook has been deprived of guaranteed process twice over—she has been deprived of her Fifth Amendment right to due process, *see* Cook Br. at 15–17, and of her right to process under the Federal Reserve Act. Accordingly, she has demonstrated irreparable harm.

Finally, allowing the President to lock Governor Cook out of her office, even temporarily, would amount to a crack in the foundation of the Federal Reserve's near-century of independence. That is a bell that could not be unrung, even if Governor Cook were ultimately reinstated.

## B. The Balance of Equities and Public Interest Strongly Support Governor Cook's Request.

Both the balance of equities and public interest weigh in favor of Governor Cook. Bluntly stated, President Trump's effort to oust Governor Cook, based on pretextual motives, reflects the greatest threat to the Federal Reserve Board's political independence in its 111-year history, and demonstrates a blatant push by the President and his allies to exert greater control over the independent central bank. Yet, the proper and autonomous operation of the Federal Reserve Board, along with the economic stability it ensures, is clearly in the public interest. That is always what Congress had intended for the national interest. As this Circuit made clear in *PHH Corporation v. Consumer Financial Protection Bureau*, "[b]y insulating the Board from presidential control and political pressures, Congress sought to ensure that the Federal Reserve would 'reflect, not the opinion of a majority of special interests, but rather the well considered judgment of a body that takes into consideration all phases of national economic life.'" 881 F.3d 75, 92 (D.C. Cir. 2018).

In addition to Congress's spoken-for intent, the public markets have also reflected and reiterated that desire for such independence in the immediate aftermath of President Trump's decision to purportedly "fire" Governor Cook. *See* Cook Br. at 20. So too have the nation's leading economic periodicals and editorial boards echoed their support for Governor Cook. *Id.* at 21 n.29. And on Wall Street, executives have acknowledged "concern" over "the seeming political motivation behind Ms. Cook's attempted ouster."[19] Accordingly, the public interest supports preserving the stability that the Federal Reserve was established to uphold, at least until a time

---

[19] Joe Rennison & Lauren Hirsch, *Markets Brush Off Fed Threats. But Concerns Linger on Wall Street.*, N.Y. Times (Aug. 26, 2025), https://www.nytimes.com/2025/08/26/business/trump-federal-reserve-stocks-lisa-cook.html.

when the novel issues presented by Governor Cook's purported removal can be properly resolved. Without it, the President's meddling may threaten to plunge the markets into panic or a sell off.

Perhaps no words are as impactful as what the Supreme Court reiterated in *Trump v. Wilcox*: "The Federal Reserve is a uniquely structured, quasi-private entity that follows in the distinct historical tradition of the First and Second Banks of the United States." 145 S. Ct. at 1415. But now, so that he can achieve "a majority" of his members on the Board, President Trump aims to disrupt that century-long tradition, and is using his FHFA Director to give him political cover do so. Governor Cook requests only that the Court maintain the current state of affairs, as such a measure would uphold key equities and public interests, while imposing a minimal burden on the President, who is attempting to exercise power beyond his constitutional and statutory authority.

## CONCLUSION

For the foregoing reasons, Governor Cook respectfully requests that this Court grant her Motion for Temporary Restraining Order and enter the attached Proposed Order.

Dated: September 2, 2025                    Respectfully Submitted,

                                            */s/ Abbe David Lowell*
                                            Abbe David Lowell [Bar No. 358651]
                                            Brenna L. Frey*
                                            David A. Kolansky [DDC No. 7680722]
                                            Isabella M. Oishi [Bar No.  90018056]
                                            Jack Bolen*
                                            LOWELL & ASSOCIATES, PLLC
                                            1250 H Street, N.W., Suite 250
                                            Washington, DC 20005
                                            T: (202) 964-6110
                                            F: (202) 964-6116
                                            ALowellpublicoutreach@lowellandassociates.com
                                            BFrey@lowellandassociates.com
                                            DKolansky@lowellandassociates.com
                                            IOishi@lowellandassociates.com
                                            JBolen@lowellandassociates.com

*Attorneys for Governor Lisa Cook*


Norman L. Eisen [Bar No. 435051]
Tianna J. Mays [Bar No. 90005882]
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
T: (202) 601-8678
norman@democracydefenders.org
tianna@democracydefenders.org

*Attorneys for Governor Lisa Cook*

\* Application for admission or admission pro hac
vice forthcoming.