Civil Action 1:25-cv-02903-JMC

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LISA D. COOK,
PLAINTIFF

v.

DONALD J. TRUMP, ET AL,
DEFENDANTS

CLERK
US DISTRICT & BANKRUPTCY
COURTS FOR DC

2025 AUG 29 P 4:59

RECEIVED

RECEIVED
Mailroom

AUG 29 2025

Angela D. Caesar, Clerk of Clerk
U.S. District Court, District of Columbia

**BRIEF OF AMICUS CURIAE MARTIN AKERMAN,
TENURED CHIEF DATA OFFICER OF THE NATIONAL GUARD BUREAU,
IN SUPPORT OF A LIMITED TEMPORARY RESTRAINING ORDER AND
DISMISSAL FOR LACK OF JURISDICTION**

MARTIN AKERMAN, PRO SE
PO BOX 100057
Arlington, VA 22210
makerman.dod@gmail.com
(202) 656-5601

JULY 28, 2025

## TABLE OF CONTENTS

STATEMENT OF INTEREST OF AMICUS CURIAE.......................... 2

SUMMARY OF ARGUMENT............................................ 2

  First, the complaint is not ripe for judicial review......... 3

  Second, the proper legal action to determine whether a person
  has the right to hold a public office is a writ of quo
  warranto..................................................... 3

  Third, a measured approach can balance the competing
  interests.................................................... 3

ARGUMENT...................................................... 4

  I. The President's Constitutional Duty to "Take Care" Requires
  Him to Act on Credible Allegations That Threaten National
  Stability.................................................... 4

  II. The Complaint Is Premature for Failure to Exhaust
  Available and More Appropriate Legal Remedies................ 5

    A. The Doctrine of Exhaustion of Remedies Is a Prudential
    Gatekeeper to Federal Courts............................. 5

    B. Quo Warranto Is the Proper Vehicle for Challenging an
    Officer's Right to Office................................ 6

    C. Congressional Remedies May Also Provide an Appropriate,
    Non-Judicial Forum....................................... 7

  III. This Court Should Decline to Exercise Jurisdiction Over a
  Non-Ripe Claim............................................... 7

  IV. A Limited TRO That Preserves Pay but Not Position Balances
  Due Process with the President's Constitutional Duties....... 8

    Immediate Solution: Paid Administrative Leave............. 9

CONCLUSION.................................................... 10

## STATEMENT OF INTEREST OF AMICUS CURIAE

Amicus curiae Martin Akerman is the tenured Chief Data Officer of the National Guard Bureau. He has a direct and substantial interest in the proper application of constitutional and statutory procedures governing the removal of federal officers. Mr. Akerman is currently litigating his own removal from a tenured federal position, a removal predicated on reasons he alleges were fabricated by the government.

His legal battle has spanned multiple forums, including an action dismissed by this Court for lack of jurisdiction (Akerman v. United States, Case No. 1:23-cv-02597 (D.D.C.)) and a pending application for a stay before the U.S. Supreme Court (Akerman v. Merit Systems Protection Board, No. 25A26). This experience provides him with a unique, ground-level perspective on the critical need for robust due process and the importance of pursuing claims in the correct jurisdiction and through the proper legal channels.

## SUMMARY OF ARGUMENT

This case presents a profound clash between two fundamental constitutional principles: the President's duty under Article II to "take Care that the Laws be faithfully executed" and a tenured officer's Fifth Amendment right to due process. The Plaintiff, Governor Lisa Cook, asks this Court to immediately adjudicate the ultimate merits of her removal. The President, meanwhile, has acted on his duty to protect the nation's financial stability from an officer facing credible allegations of financial impropriety.

This brief argues for a third path—one of procedural prudence that respects both principles without prematurely deciding the merits. While the President must have the ability to address potential threats within his administration, a tenured officer must be afforded due process. However, the Plaintiff has chosen the wrong forum and the wrong legal vehicle for her challenge.

## First, the complaint is not ripe for judicial review.

The doctrine of exhaustion of administrative remedies requires a plaintiff to pursue available agency-level and statutory processes before seeking relief in federal court. Governor Cook has bypassed these established procedures.

## Second, the proper legal action to determine whether a person has the right to hold a public office is a writ of quo warranto.

This is not a mere technicality; it is a specific cause of action, codified for use against federal officers in the District of Columbia, designed to provide an orderly, fact-based resolution to precisely this type of dispute. By filing a general complaint for injunctive relief, the Plaintiff attempts an end-run around the correct legal process. This Court has previously, in a case involving amicus, dismissed a petition for lack of jurisdiction, correctly directing the litigant to the proper forum. It should exercise the same prudence here.

## Third, a measured approach can balance the competing interests.

This Court should grant the Temporary Restraining Order (TRO), but only for the limited purpose of maintaining Governor Cook on paid administrative leave. This protects her property interest in her salary, satisfying the core requirement of Loudermill due process, while removing her from the execution of her official duties. This respects the President's constitutional prerogative under the Take Care Clause to ensure that an individual facing serious allegations is not actively wielding power over the nation's financial system.

Therefore, amicus urges the Court to grant a limited TRO and dismiss the remainder of the complaint without prejudice, directing the Plaintiff to pursue her claims through the proper administrative and judicial channels, beginning with a petition for a writ of quo warranto.

ARGUMENT

I. The President's Constitutional Duty to "Take Care" Requires
Him to Act on Credible Allegations That Threaten National
Stability.

The Constitution vests the executive power in the President and
charges him with the solemn duty to "take Care that the Laws be
faithfully executed". This is not a passive obligation; it is an
active mandate to supervise the executive branch and ensure its
integrity. This duty is especially acute when it concerns
officials at the highest levels of government, whose actions can
have profound effects on national security and financial
stability.

In this case, the President was presented with a criminal
referral from the Director of the Federal Housing Finance Agency
alleging that Governor Cook, a member of the body that maintains
the stability of the nation's financial system, may have
committed mortgage fraud. An allegation of financial deceit
against an official charged with overseeing the nation's
monetary policy is not a trivial matter. It strikes at the heart
of the trust and integrity required for such a position.

The President's power to remove executive officers is a key tool
for fulfilling his Take Care duty. It ensures that he can hold
his subordinates accountable and maintain a cohesive
administration capable of faithfully executing the laws. While
Congress may, in certain circumstances, provide for-cause
removal protections, such protections cannot be interpreted to
paralyze the President when he is faced with credible
allegations of misconduct that threaten the very mission of an
agency.

To be clear, this is not an argument on the ultimate truth of
the allegations against Governor Cook. That is a matter for a
proper fact-finding process. Rather, it is to establish that the
President has a compelling, constitutionally grounded reason to
act. He cannot be expected to ignore a formal criminal referral
against a Federal Reserve Governor and simply hope for the best.
His duty to "take Care" compels him to address the potential
threat to the integrity of the nation's financial system.

The question before this Court is not whether the President was right on the merits, but whether the Plaintiff has followed the correct procedure to challenge his action.

## II. The Complaint Is Premature for Failure to Exhaust Available and More Appropriate Legal Remedies.

**A.  The Doctrine of Exhaustion of Remedies Is a Prudential Gatekeeper to Federal Courts.**

Federal courts do not serve as the forum of first resort for disputes with government agencies. The long-standing doctrine of exhaustion of administrative remedies holds that "no one is entitled to judicial relief for a threatened injury until the prescribed administrative remedy has been exhausted". This doctrine promotes judicial efficiency and respects the autonomy of the administrative process by allowing agencies to develop a factual record, apply their expertise, and correct their own errors before a court intervenes.

Federal employees challenging adverse personnel actions are typically required to exhaust these remedies before filing suit in district court. The process generally involves a notice of proposed action, an opportunity for the employee to respond, and a final agency decision, which can then be appealed to bodies like the Merit Systems Protection Board (MSPB).

Here, Governor Cook has filed a complaint seeking immediate injunctive and declaratory relief directly in district court, bypassing any potential administrative or alternative legal remedies. This shortcuts the orderly process designed to handle such disputes and asks the Court to rule on a complex constitutional issue without a fully developed record or the benefit of a prior administrative determination. As the Supreme Court has noted, exhaustion requirements prevent courts from making premature decisions. This case is a prime example of a matter that is not yet ripe for full judicial review on the merits.

**B. Quo Warranto Is the Proper Vehicle for Challenging an Officer's Right to Office.**

The Plaintiff's procedural error is not merely the failure to exhaust administrative remedies in general; it is the failure to employ the specific legal action designed for this exact situation: the writ of quo warranto.

Quo warranto—Latin for "by what authority"—is a special legal action used to challenge a person's legal right to hold a public office. It is the mechanism to test whether an officeholder is "constitutionally and legally authorized to perform any act in, or exercise any functions of, the office". It is not a tool to evaluate job performance, but to resolve a dispute over the legal title to the office itself. This perfectly describes the core of Governor Cook's claim: that she, and not a successor, has the legal right to hold the office of Federal Reserve Governor.

Crucially, the remedy of quo warranto is not an obscure relic. Congress has explicitly codified the action for use against federal officers in the District of Columbia. Title 16, Chapter 35 of the D.C. Code governs these proceedings. The process requires the person challenging the officeholder (the "relator") to seek leave from the U.S. Attorney or the court to bring the action. This process serves as an important check, protecting public officials from frivolous lawsuits while providing a clear, orderly path for legitimate challenges.

By filing a complaint for declaratory and injunctive relief, Governor Cook seeks to have this Court declare that she remains a member of the Board. This is precisely the determination a

quo warranto action is designed to make. Her choice of legal vehicle appears to be a strategic attempt to bypass the established statutory scheme and obtain an immediate merits ruling. This Court should not permit such a procedural shortcut. The existence of this specific statutory remedy makes the current complaint improper and premature.

**C. Congressional Remedies May Also Provide an Appropriate, Non-Judicial Forum.**

Beyond administrative processes and quo warranto, it is plausible that the ultimate remedy for a dispute between the President and a Senate-confirmed officer lies with the legislative branch. Congress possesses robust oversight authority over the executive branch, derived from its enumerated powers and the Necessary and Proper Clause. This "power of inquiry" is a fundamental part of our system of checks and balances.

Congress created the Federal Reserve and structured its leadership, including the for-cause removal protection at issue. A dispute over the interpretation and application of that statute is a matter of intense congressional interest. Congress has the power to hold hearings, subpoena witnesses, and demand information from the executive branch to investigate the circumstances of Governor Cook's removal.

While congressional action may not provide the immediate reinstatement Governor Cook seeks, it represents a constitutionally contemplated avenue for resolving inter-branch disputes over the execution of the laws. The availability of this powerful non-judicial remedy further counsels against premature judicial intervention. The courts should be the last resort in such a political conflict, not the first.

## III. This Court Should Decline to Exercise Jurisdiction Over a Non-Ripe Claim.

This Court has previously and correctly demonstrated judicial restraint when faced with a petition filed in the wrong jurisdiction. In Akerman v. United States, Case No. 1:23-cv-02597, this Court, with Judge Jia M. Cobb presiding, dismissed amicus's § 2255 petition without prejudice because it appeared to arise from a conviction not entered in this court, over which jurisdiction was lacking. The Court properly declined to hear a case that should have been brought elsewhere.

The same principle applies here, albeit on grounds of ripeness and exhaustion rather than geography. Governor Cook has brought a claim for which a specific, alternative legal framework (quo warranto) exists and for which she has not exhausted available remedies. Her claim is therefore not ripe for adjudication on the merits by this Court. Just as this Court directed amicus to the proper forum, it should now direct Governor Cook to the proper legal process.

Allowing this case to proceed would invite any removed federal officer to bypass the established administrative and statutory schemes and seek immediate review in district court. This would undermine the authority of bodies like the MSPB and render the specific writ of quo warranto a nullity. It would place the judiciary in the position of being the primary arbiter of executive branch personnel disputes, a role for which it is ill-suited and which the law assigns elsewhere. This Court should affirm its prior commitment to jurisdictional propriety and dismiss the complaint.

## IV. A Limited TRO That Preserves Pay but Not Position Balances Due Process with the President's Constitutional Duties.

While the complaint should be dismissed on jurisdictional and procedural grounds, the Court can and should provide a limited, temporary remedy that balances the equities at stake. Amicus supports the issuance of a TRO for the sole purpose of maintaining Governor Cook on a paid, non-duty status pending the resolution of her claims through the proper channels.

This approach is grounded in the Supreme Court's landmark decision in Cleveland Board of Education v. Loudermill.

Loudermill established that a public employee with a property interest in their job (created by a "for cause" protection) is entitled to notice and "some kind of hearing" before being deprived of that property. The property interest at stake is continued employment, which includes pay and benefits.

**Immediate Solution: Paid Administrative Leave**

By placing Governor Cook on paid administrative leave, the Court would prevent the deprivation of her property interest in her salary without a hearing, thus satisfying the core requirement of procedural due process. This temporary measure would give her the opportunity to initiate a quo warranto action or pursue other remedies to challenge her removal.

At the same time, this limited remedy respects the President's Article II authority. It would remove Governor Cook from the exercise of her official duties, ensuring that an officer under a cloud of credible allegations of financial impropriety is not making critical decisions about the nation's monetary policy. This addresses the President's legitimate concern under the Take Care Clause.

This approach is particularly important given the potential for removal actions to be based on pretextual grounds. Amicus knows this from personal experience. In his own case, he alleges that the government fabricated the reason for his removal as a reprisal for protected whistleblower activity. This highlights the danger of allowing a removal to be fully effectuated before a robust, fact-finding process can occur. A

quo warranto proceeding would provide such a process. A limited TRO preserving pay ensures the officer can sustain themselves while that process unfolds, providing a crucial safeguard against potentially arbitrary executive action.

## CONCLUSION

For the foregoing reasons, amicus curiae Martin Akerman respectfully urges this Court to:

A. GRANT the Plaintiff's Motion for a Temporary Restraining Order for the limited purpose of placing Governor Cook on paid administrative leave, thereby preserving her pay and benefits pending further proceedings.

B. DISMISS the remainder of the Complaint without prejudice for failure to exhaust administrative and legal remedies and for lack of ripeness.

C. DIRECT the Plaintiff to pursue her claims through the proper statutory remedy of a writ of quo warranto.

Respectfully Submitted,

MARTIN AKERMAN, PRO SE
PO BOX 100057
Arlington, VA 22210
makerman.dod@gmail.com
(202) 656-5601

Civil Action 1:25-cv-02903-JMC

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LISA D. COOK,
PLAINTIFF

v.

DONALD J. TRUMP, ET AL,
DEFENDANTS

Order of the Supreme Court of the United States in Trump v.
Wilcox, 599 U.S. ___ (2025) (No. 24A966), issued May 22, 2025

Cite as: 605 U. S. ____ (2025)     1

# SUPREME COURT OF THE UNITED STATES

No. 24A966

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* GWYNNE A. WILCOX, ET AL.

ON APPLICATION FOR STAY

[May 22, 2025]

The Government has applied for a stay of orders from the District Court for the District of Columbia enjoining the President's removal of a member of the National Labor Relations Board (NLRB) and a member of the Merit Systems Protection Board (MSPB), respectively. The President is prohibited by statute from removing these officers except for cause, and no qualifying cause was given. See 29 U. S. C. §153(a); 5 U. S. C. §1202(d).

The application for stay presented to THE CHIEF JUSTICE and by him referred to the Court is granted. Because the Constitution vests the executive power in the President, see Art. II, §1, cl. 1, he may remove without cause executive officers who exercise that power on his behalf, subject to narrow exceptions recognized by our precedents, see *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. 197, 215–218 (2020). The stay reflects our judgment that the Government is likely to show that both the NLRB and MSPB exercise considerable executive power. But we do not ultimately decide in this posture whether the NLRB or MSPB falls within such a recognized exception; that question is better left for resolution after full briefing and argument. The stay also reflects our judgment that the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty. See *Trump* v. *International*

*Refugee Assistance Project*, 582 U. S. 571, 580 (2017) (*per curiam*) ("The purpose of . . . interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." (citation omitted)). A stay is appropriate to avoid the disruptive effect of the repeated removal and reinstatement of officers during the pendency of this litigation.

Finally, respondents Gwynne Wilcox and Cathy Harris contend that arguments in this case necessarily implicate the constitutionality of for-cause removal protections for members of the Federal Reserve's Board of Governors or other members of the Federal Open Market Committee. See Response of Wilcox in Opposition to App. for Stay 2–3, 27–28; Response of Harris in Opposition to App. for Stay 3, 5–6, 16–17, 36, 40. We disagree. The Federal Reserve is a uniquely structured, quasi-private entity that follows in the distinct historical tradition of the First and Second Banks of the United States. See *Seila Law*, 591 U. S., at 222, n. 8.

The March 4, 2025, order of the United States District Court for the District of Columbia, No. 25–cv–412, ECF Doc. 39, and the March 6, 2025, order of the United States District Court for the District of Columbia, No. 25–cv–334, ECF Doc. 34, are stayed pending the disposition of the appeal in the United States Court of Appeals for the District of Columbia Circuit and disposition of a petition for a writ of certiorari, if such a writ is timely sought. Should certiorari be denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court.

KAGAN, J., dissenting

# SUPREME COURT OF THE UNITED STATES

No. 24A966

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* GWYNNE A. WILCOX, ET AL.

ON APPLICATION FOR STAY

[May 22, 2025]

JUSTICE KAGAN, with whom JUSTICE SOTOMAYOR and JUSTICE JACKSON join, dissenting from the grant of the application for stay.

For 90 years, *Humphrey's Executor* v. *United States*, 295 U. S. 602 (1935), has stood as a precedent of this Court. And not just any precedent. *Humphrey's* undergirds a significant feature of American governance: bipartisan administrative bodies carrying out expertise-based functions with a measure of independence from presidential control. The two such agencies involved in this application are the National Labor Relations Board (NLRB) and Merit Systems Protection Board (MSPB). But there are many others— among them, the Federal Communications Commission (FCC), Federal Trade Commission (FTC), and Federal Reserve Board. Congress created them all, though at different times, out of one basic vision. It thought that in certain spheres of government, a group of knowledgeable people from both parties—none of whom a President could remove without cause—would make decisions likely to advance the long-term public good. And that congressional judgment, *Humphrey's* makes clear, creates no conflict with the Constitution. Rejecting a claim that the removal restriction enacted for the FTC interferes with "the executive power," the *Humphrey's* Court held that Congress has authority, in creating such "quasi-legislative or quasi-judicial" bodies, to "forbid their [members'] removal except for cause." *Id.,* at

626, 629. Indeed, that conclusion "cannot well be doubted." *Id.,* at 629; see also *Wiener* v. *United States,* 357 U. S. 349 (1958) (reaffirming *Humphrey's*).

The current President believes that *Humphrey's* should be either overruled or confined. See Application 14; Letter from S. Harris, Acting Solicitor General, to Rep. J. Raskin, Re: Restrictions on the Removal of Certain Principal Officers of the United States (Feb. 12, 2025). And he has chosen to act on that belief—really, to take the law into his own hands. Not since the 1950s (or even before) has a President, without a legitimate reason, tried to remove an officer from a classic independent agency—a multi-member, bipartisan commission exercising regulatory power whose governing statute contains a for-cause provision. Yet now the President has discharged, concededly without cause, several such officers, including a member of the NLRB (Gwynne Wilcox) and a member of the MSPB (Cathy Harris). Today, this Court effectively blesses those deeds. I would not. Our *Humphrey's* decision remains good law, and it forecloses both the President's firings and the Court's decision to award emergency relief.

Our emergency docket, while fit for some things, should not be used to overrule or revise existing law. We consider emergency applications "on a short fuse without benefit of full briefing and oral argument"; and we resolve them without fully (or at all) stating our reasons. *Does 1–3* v. *Mills,* 595 U. S. ___, ___ (2021) (BARRETT, J., concurring in denial of application for injunctive relief) (slip op., at 1). It is one thing to grant relief in that way when doing so vindicates established legal rights, which somehow the courts below have disregarded. It is a wholly different thing to skip the usual appellate process when issuing an order that itself changes the law. See, *e.g., Netchoice, LLC* v. *Paxton,* 596 U. S. ___, ___ (2022) (ALITO, J., dissenting from grant of application to vacate stay) (slip op., at 2) (demanding that an applicant for relief have a good claim "under existing law");

Cite as: 605 U. S. ____ (2025)          3

KAGAN, J., dissenting

*Merrill* v. *Milligan*, 595 U. S. __, __ (2022) (ROBERTS, C. J., dissenting from grant of applications for stays) (slip op., at 1) (same); *id.,* 595 U. S., at __ (KAGAN, J., dissenting from grant of applications for stays) (slip op., at 1) (same). And nowhere is short-circuiting our deliberative process less appropriate than when the ruling requested would disrespect—by either overturning or narrowing—one of this Court's longstanding precedents, like our nearly century-old *Humphrey's* decision.

Under that decision, this case is easy, as the courts below found: The President has no legal right to relief. Congress, by statute, has protected members of the NLRB and MSPB (like Wilcox and Harris) from Presidential removal except for good cause. See 29 U. S. C. §153(a) (permitting removal only for "neglect of duty or malfeasance in office"); 5 U. S. C. §1202(d) (permitting removal only for "inefficiency, neglect of duty, or malfeasance in office"). And, again, *Humphrey's* instructs that Congress can do so without offending the Constitution. Just like the agency at issue there (the FTC), the NLRB and MSPB are multi-member bodies of experts, balanced along partisan lines, with "quasi-legislative or quasi-judicial" (not "purely executive") functions. *Humphrey's*, 295 U. S., at 628, 631; see *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. 197, 204, 216–217 (2020). So both fit securely within the ambit of *Humphrey's*—as no one in the history of either agency has ever doubted. That means to fire their members, the President—under existing law—needs good cause, which he admits he does not have. The only way out of that box is to upend *Humphrey's*.

For that reason, the majority's order granting the President's request for a stay is nothing short of extraordinary. That order consents to the President's (statutorily barred) removal of the NLRB and MSPB Commissioners, at least until we decide their suits on the merits. And so the order allows the President to overrule *Humphrey's* by fiat, again

KAGAN, J., dissenting

pending our eventual review.  This Court often reminds
other judges that if one of our precedents "has direct appli-
cation in a case," they must follow it, even if they dislike
it—"leaving to this Court the prerogative of overruling its
own decisions." *Rodriguez de Quijas* v. *Shearson/American
Express, Inc.*, 490 U. S. 477, 484 (1989).  In keeping with
that directive, lower courts recently faced with challenges
to independent agencies' removal provisions have uni-
formly rejected them based on *Humphrey's.* See, *e.g., Con-
sumers' Research* v. *Consumer Product Safety Comm'n*, 91
F. 4th 342, 346 (CA5 2024) (Willett, J.) ("As middle-man-
agement circuit judges, we must follow binding precedent,"
which *Humphrey's* remains); *Leachco, Inc.* v. *Consumer
Product Safety Comm'n*, 103 F. 4th 748, 760–763 (CA10
2024) (similar); *Meta Platforms, Inc.* v. *FTC*, 2024 WL
1549732, *2 (CADC, Mar. 29, 2024) (*per curiam*) (similar).
It should go without saying that the President must like-
wise follow existing precedent, however strong he thinks
the arguments against it—unless and until he convinces us
to reject what we previously held.  Yet here the President
fired the NLRB and MSPB Commissioners in the teeth of
*Humphrey's*, betting that this Court would acquiesce.  And
the majority today obliges—without so much as mentioning
*Humphrey's.*

The majority's explanation of its action unfolds in two
parts, neither rising to the occasion.

The first gestures toward the merits, but in a most unu-
sual and unedifying way.  Our normal (invariable?) practice
is to grant a stay pending appeal only when we decide the
applicant is likely to succeed on the merits. See, *e.g., Hol-
lingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*).
But the majority's order purports not to reach that conclu-
sion.  According to the majority, the President may remove
without cause officers exercising executive power, "subject
to narrow exceptions recognized by our precedents." *Ante,*
at 1.  The majority will not say the name of the relevant

KAGAN, J., dissenting

precedent, but one of those "exceptions" of course comes from *Humphrey's*. See *Seila Law*, 591 U. S., at 204, 215–217. The question thus becomes: Does *Humphrey's* protect the NLRB and MSPB Commissioners? Well, the majority says, those officers likely exercise "considerable executive power"; but whether they fall within "a recognized exception"—*i.e.*, *Humphrey's*—is better left for the future. *Ante,* at 1. So the majority's order just restates the question this case raises—despite the need to give a preliminary answer before ordering relief. Unless . . . unless the majority thinks it has provided a hint. Maybe by saying that the Commissioners exercise "considerable" executive power, the majority is suggesting that they cannot fall within the *Humphrey's* "exception." But if that is what the majority means, then it has foretold a massive change in the law—reducing *Humphrey's* to nothing and depriving members of the NLRB, MSPB, and many other independent agencies of tenure protections. And it has done so on the emergency docket, with little time, scant briefing, and no argument.

The second part of the majority's explanation, focusing on what we typically call the balance of equities, in no way compensates for the first's failures. Here, the majority reasons that a stay is justified because the interests at stake are lopsided. "[T]he Government," it declares, "faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." *Ante,* at 1. But that statement misapprehends, on both sides, what this case involves.

On the latter side, the relevant interest is not the "wrongfully removed officer[s']," but rather Congress's and, more broadly, the public's. What matters, in other words, is not that Wilcox and Harris would love to keep serving in their nifty jobs. What matters instead is that Congress provided for them to serve their full terms, protected from a President's desire to substitute his political allies. See *Wiener,*

357 U. S., at 354. Or differently put, the interest at stake
is in maintaining Congress's idea of independent agencies:
bodies of specialists balanced along partisan lines, which
will make sound judgments precisely because not fully con-
trolled by the White House. Even without *Humphrey's*, this
Court would have to give respect, in balancing equities, to
Congress's expression of that idea in legislation. See
*Turner Broadcasting System, Inc.* v. *FCC*, 507 U. S. 1301,
1302 (1993) (Rehnquist, C. J., in chambers) (Acts of Con-
gress "should remain in effect pending a final decision on
the merits by this Court"); *Walters* v. *National Assn. of Ra-
diation Survivors*, 468 U. S. 1323, 1324 (1984) (Rehnquist,
J., in chambers) ("The presumption of constitutionality
which attaches to every Act of Congress" is "an equity to be
considered" in the stay analysis). And of course the Court
is not without *Humphrey's*, which already approved the
kind of removal restrictions at issue here. Given that deci-
sion—and the near-century of administrative practice that
has followed—the majority has no excuse for so misidenti-
fying the interest that cuts against unconstrained removal.
It is, again, the interest in the NLRB, MSPB, and all their
ilk working as Congress intended them to, on the view that
a measure of independence would serve the public good.

And on the former side of the balance, the majority dis-
torts and overstates the interest in preventing Wilcox and
Harris from continuing in office. That interest, to begin
with, is not "the Government['s]," *ante*, at 1, but only the
President's. Congress, after all, is also part of the Govern-
ment, and (as just noted) its equities lie in preserving the
legislation it has enacted to limit removals. And as to the
President's interest in firing Wilcox and Harris, the major-
ity gives it more weight than it has borne in almost a cen-
tury. Between *Humphrey's* and now, 14 different Presi-
dents have lived with Congress's restrictions on firing
members of independent agencies. No doubt many would
have preferred it otherwise. But can it really be said, after

all this time, that the President has a crying need to discharge independent agency members right away—before this Court (surely next Term) decides the fate of *Humphrey's* on the merits? The impatience to get on with things—to *now* hand the President the most unitary, meaning also the most subservient, administration since Herbert Hoover (and maybe ever)—must reveal how that eventual decision will go. In valuing so highly—in an emergency posture—the President's ability to fire without cause Wilcox and Harris and everyone like them, the majority all but declares *Humphrey's* itself the emergency.*

Except apparently for the Federal Reserve. The majority closes today's order by stating, out of the blue, that it has no bearing on "the constitutionality of for-cause removal protections" for members of the Federal Reserve Board or Open Market Committee. *Ante,* at 2. I am glad to hear it, and do not doubt the majority's intention to avoid imperiling the Fed. But then, today's order poses a puzzle. For the Federal Reserve's independence rests on the same constitutional and analytic foundations as that of the NLRB, MSPB, FTC, FCC, and so on—which is to say it rests largely on *Humphrey's*. So the majority has to offer a different story: The Federal Reserve, it submits, is a "uniquely structured" entity with a "distinct historical tradition"—and it cites for that proposition footnote 8 of this Court's opinion in *Seila Law. Ante,* at 2 (citing 591 U. S., at 222, n. 8). But—sorry—footnote 8 provides no support. Its only relevant sentence rejects an argument made in the dissenting

---

*The majority also justifies its stay on the ground that it will "avoid the disruptive effect of the repeated removal and reinstatement of officers during the pendency of this litigation." *Ante,* at 2. But that reason, too, gives the ultimate game away. As this case came to us, Wilcox and Harris had been reinstated to their positions, by the combined rulings of the district and appellate courts. So by re-removing them, the majority's order itself causes disruption—except, of course, if that order presumes or implies that they will be re-removed next Term anyway.

opinion "even assuming [that] financial institutions like the
Second Bank and Federal Reserve can claim a special his-
torical status." And so an assumption made to humor a dis-
sent gets turned into some kind of holding. Because one
way of making new law on the emergency docket (the dep-
recation of *Humphrey's*) turns out to require yet another
(the creation of a bespoke Federal Reserve exception). If
the idea is to reassure the markets, a simpler—and more
judicial—approach would have been to deny the President's
application for a stay on the continued authority of *Humph-
rey's.*

   "To avoid an arbitrary discretion in the courts," Hamilton
wrote, "it is indispensable that they should be bound down
by strict rules and precedents." Federalist No. 78, p. 529 (J.
Cooke ed. 1961). Today's order, however, favors the Presi-
dent over our precedent; and it does so unrestrained by the
rules of briefing and argument—and the passage of time—
needed to discipline our decision-making. I would deny the
President's application. I would do so based on the will of
Congress, this Court's seminal decision approving inde-
pendent agencies' for-cause protections, and the ensuing 90
years of this Nation's history. Respectfully, I dissent.

Cite as: 605 U. S. \_\_\_\_ (2025)        1

# SUPREME COURT OF THE UNITED STATES

No. 24A966

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* GWYNNE A. WILCOX, ET AL.

ON APPLICATION FOR STAY

[May 22, 2025]

The Government has applied for a stay of orders from the District Court for the District of Columbia enjoining the President's removal of a member of the National Labor Relations Board (NLRB) and a member of the Merit Systems Protection Board (MSPB), respectively. The President is prohibited by statute from removing these officers except for cause, and no qualifying cause was given. See 29 U. S. C. §153(a); 5 U. S. C. §1202(d).

The application for stay presented to THE CHIEF JUSTICE and by him referred to the Court is granted. Because the Constitution vests the executive power in the President, see Art. II, §1, cl. 1, he may remove without cause executive officers who exercise that power on his behalf, subject to narrow exceptions recognized by our precedents, see *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. 197, 215−218 (2020). The stay reflects our judgment that the Government is likely to show that both the NLRB and MSPB exercise considerable executive power. But we do not ultimately decide in this posture whether the NLRB or MSPB falls within such a recognized exception; that question is better left for resolution after full briefing and argument. The stay also reflects our judgment that the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty. See *Trump* v. *International*

2                         TRUMP *v.* WILCOX

*Refugee Assistance Project*, 582 U. S. 571, 580 (2017) (*per curiam*) ("The purpose of . . . interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." (citation omitted)).  A stay is appropriate to avoid the disruptive effect of the repeated removal and reinstatement of officers during the pendency of this litigation.

Finally, respondents Gwynne Wilcox and Cathy Harris contend that arguments in this case necessarily implicate the constitutionality of for-cause removal protections for members of the Federal Reserve's Board of Governors or other members of the Federal Open Market Committee. See Response of Wilcox in Opposition to App. for Stay 2–3, 27–28; Response of Harris in Opposition to App. for Stay 3, 5–6, 16–17, 36, 40.  We disagree.  The Federal Reserve is a uniquely structured, quasi-private entity that follows in the distinct historical tradition of the First and Second Banks of the United States.  See *Seila Law*, 591 U. S., at 222, n. 8.

The March 4, 2025, order of the United States District Court for the District of Columbia, No. 25–cv–412, ECF Doc. 39, and the March 6, 2025, order of the United States District Court for the District of Columbia, No. 25–cv–334, ECF Doc. 34, are stayed pending the disposition of the appeal in the United States Court of Appeals for the District of Columbia Circuit and disposition of a petition for a writ of certiorari, if such a writ is timely sought.  Should certiorari be denied, this stay shall terminate automatically.  In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court.